**CAPITAL REAL ESTATE INVESTORS TAX EXEMPT FUND LIMITED PARTNERSHIP, et al., Plaintiffs,**

v.

**Martin C. SCHWARTZBERG, Defendant.**

No. 96 Civ. 1186 (LAK).

United States District Court,
S.D. New York.

March 18, 1996.

Robert B. Hirsch, Howard V. Sinclair, Hunter T. Carter, Washington, DC, Nancy S. Appel, New York City, Arent Fox Kintner Plotkin & Kahn, Washington, DC, for Plaintiffs Capital Realty Investors Tax Exempt Fund, Limited Partnership and Capital Realty Investors Tax Exempt Fund III Limited Partnership.

Deborah L. Thaxter, Kevin J. Handly, Sigmund J. Roos, Elizabeth M. Rice, Peabody & Brown, Boston, MA, for Plaintiffs CRITEF Associates Limited Partnership, CRITEF III Associates Limited Partnership, and C.R.I., Inc.

Marc Cherno, Audrey M. Samers, Yasho Lahiri, Fried, Frank, Harris, Shriver & Jacobson, New York City, for Defendant.

## OPINION

KAPLAN, District Judge.

Plaintiffs Capital Realty Investors Tax Exempt Fund Limited Partnership ("CRITEF") and Capital Realty Investors Tax Exempt Fund III Limited Partnership ("CRITEF III") (collectively, the "Funds") are publicly traded real estate limited partnerships managed by entities controlled by William Dockser and H. William Willoughby. The Funds are the subjects of proposed mergers with affiliates of Apollo Real Estate Acquisition Corporation ("Apollo"). Defendant Martin C. Schwartzberg, formerly a close associate of Dockser and Willoughby, seeks to block the mergers and replace the Dockser–Willoughby interests as general partners of the Funds.

The Dockser–Willoughby entities contend that two press releases issued by Schwartzberg, which questioned their integrity and criticized the proposed mergers, constituted proxy solicitations which were unlawful in consequence of Schwartzberg's failure to file proxy statements with the Securities and Exchange Commission ("SEC") and disseminate them to security holders in violation of Rules 14a–3 and 14a–6 under the Securities Exchange Act of 1934 (the "Exchange Act"), 17 C.F.R. §§ 240.14a–3, 14a–6 (1995). They claim also that the press releases were materially false and misleading and thus violated Exchange Act Rule 14a–9, 17 C.F.R. § 240.14a–9. They move for a preliminary injunction. Schwartzberg responds that the press releases were neither proxy solicitations nor materially false and misleading. The motion raises novel issues under Rule 14a–1, as amended by the SEC in 1992,[1] 17

---

1. Securities Exchange Act Rel. No. 34–31326, 57 Fed.Reg. 48276 (Oct. 22, 1992) (the "Adopting Release").

C.F.R. § 240.14a–1, to provide a "safe harbor" for certain press releases which announce the way in which a security holder intends to vote and the reasons therefor.[2]

### Facts

Dockser, Willoughby and Schwartzberg at one time were equal participants in a series of real estate investments and ventures that involved a variety of business entities including those involved in this case, particularly C.R.I., Inc. ("CRI"). The CRI Business, a term the Court will use to refer generally to the array of ventures with which Dockser and Willoughby now have connections, today includes publicly held real estate funds including CRITEF and CRITEF III, private real estate partnerships, CRI and, it appears, other entities involved in activities such as property management.

#### The CRITEF Funds

The Funds are creatures of the boom of the late 1980s just as this dispute is an indirect outgrowth of its end. Both were formed for the purpose of acquiring portfolios of tax exempt bonds which were collateralized by non-recourse participating first mortgage loans on multifamily residential real estate developments. (Proxy[3] 19) Their stated objectives were to provide tax exempt distributions and preservation of capital. (*Id.*) Both no doubt reflected also a desire on the part of Dockser, Willoughby and Schwartzberg to expand the CRI Business by raising capital publicly.

The structures of the Funds are somewhat complex. Each is organized as a Delaware limited partnership with a single general partner that has a 1.01 percent interest in the fund. (*Id.* 5, 9) The general partner in each case is another limited partnership— CRITEF Associates LP ("CRITEF Associates") in the case of CRITEF and CRITEF III Associates LP ("CRITEF III Associates") in the case of CRITEF III. CRI is the sole general partner of CRITEF III Associates and the managing general partner of CRITEF Associates. The other general partners of CRITEF Associates are Dockser, Willoughby and Schwartzberg. (*Id.* 5; Schwartzberg Decl. ¶ 1 & nn. 1, 2)

Each of the funds has an "assignor limited partner" which has assigned beneficial interests in its limited partnership interest in the Fund to holders of Beneficial Assignee Certificates, or BACs. Holders of the BACs in effect have all of the rights of limited partners, including the right to vote on certain partnership matters.

The BACs are registered with the SEC pursuant to Section 12 of the Exchange Act, were sold to the public in offerings conducted in the late 1980s, and are traded on the American Stock Exchange. (Proxy S000341, 19) The public offerings raised over $269.5 million, divided approximately evenly between CRITEF and CRITEF III. (*Id.* 5)

#### The 1990 Schwartzberg Transaction

For reasons that are not clear on this record, Schwartzberg and his erstwhile partners began to disengage from one another in 1989. As of January 1, 1990, Schwartzberg withdrew from CRI and sold his interests in CRI and associated companies for $4.7 million and other consideration. The divorce, however, was not absolute. Schwartzberg remained a general partner in CRITEF Associates and retained limited partnership interests in both CRITEF Associates and CRITEF III Associates. CRI and related entities entered into a consulting agreement with Schwartzberg, the performance of which Schwartzberg subcontracted to his company, Capital Management Strategies, Inc. ("CMS"). But CRI indemnified him broadly for liabilities arising from CRI and the related entities. (Willoughby Decl. ¶¶ 5–6)

#### The Genesis of the Present Dispute

The Funds have been less than a success. Most of the mortgage loans on the properties securing the mortgage revenue bonds held by them are in default, and the underlying properties were assigned or transferred in

---

**2.** The parties have waived an evidentiary hearing.

**3.** "Proxy" refers to the draft proxy statement, dated September 28, 1985, a copy of which is included in Exhibit 2 to the declaration of Hunter Carter and marked Dep.Ex. 2.

the late 1980s or early 1990s[4] to so-called Owner Partnerships, nominees of the Funds, by deeds in lieu of foreclosure or otherwise. (*See* Proxy 20; Carter Decl. Ex. 4, at 15, 16; *id.* Ex. 5, at 20) Affiliates of CRI took over the management of all or most of these properties pursuant to management contracts that presumably require the payment of management fees.[5]

In late 1993, CRI explored the possibility of putting all or part of its management operations as well as certain properties into a real estate investment trust ("REIT") and conducting a public offering of the REIT. The effort, however, was a failure. (Schwartzberg Dep. 32–34, 41–42) Perhaps as a consequence, on February 1, 1994, CRI and affiliates transferred management contracts on a number of properties, including thirteen of the eighteen multifamily properties securing the bonds held by the Funds, to an Apollo affiliate, Capital Apartment Properties, Inc. ("CAPREIT") in exchange for limited partnership interests aggregating a maximum of 22 percent (assuming certain hurdle rates were met) in CAPREIT's immediate parent entity, AP CAPREIT Partners L.P. ("AP CAPREIT").[6] The relationship between CRI and CAPREIT is significant because the transaction in which the CRI Business' interests in AP CAPREIT were extinguished figures in the analysis of the claims against Schwartzberg.

### The Initial Merger Overture

According to the draft proxy statement, CAPREIT approached Dockser and Willoughby in January 1995 to discuss a possible tender offer by CAPREIT for the BACs. In March 1995, however, CAPREIT proposed mergers of the Funds into subsidiaries of CAPREIT. But on April 3, 1995, Dockser and Willoughby are said to have indicated that they would not proceed with discussions regarding the mergers until CAPREIT had financing in place. (Proxy 20) CAPREIT

thereupon sought financing. But discussions regarding a subject other than the mergers evidently proceeded.

### The AP CAPREIT Redemption

On June 30, 1995, the CRI Business' limited partnership interests in CAPREIT were redeemed by AP CAPREIT in exchange for $4.75 million. (Proxy 23–24; Carter Decl. Ex. 9) Pursuant to the terms of the Redemption Agreement, however, CRI and its affiliates agreed to pay to CAPREIT in certain circumstances as much as $3.55 million if certain management contracts, including contracts relating to certain properties securing the mortgage revenue bonds held by the Funds, are terminated other than a termination following acquisition of the property by CAPREIT or its affiliates. (Proxy 24; Redemption Agreement, Carter Decl. Ex. 9, ¶ 5a) Thus, although merger discussions allegedly were "on hold" as of the date of the redemption agreement, the prospect of mergers of the Funds into CAPREIT subsidiaries was very much in view.

### The Merger Agreements and their Consequences

Merger plans proceeded during the summer. On September 11, 1995, the parties entered into agreements to merge CRITEF and CRITEF III into subsidiaries of CAPREIT for $150 million in cash. The salient terms included the following:

(a) BAC holders were to receive cash as follows: CRITEF Series I—$13.761 per BAC; CRITEF Series II—$13.313 per BAC; and CRITEF III—$14.36 per BAC.

(b) The general partners of each Fund would sell their general partnership interests to CAPREIT or its designee for $500,000 each.

(c) On the closing date, CAPREIT or its designee would acquire allegedly accrued mortgage servicing fees payable to (i) CRI

---

4. The draft proxy statement dates these transactions to 1991 through 1993. (Proxy 10) At oral argument, counsel for the Funds placed them in 1988. (Tr., Mar. 5, 1996, at 21) The precise timing is not material to this motion.

5. The mortgage loans mature in 1998 through 2002, and the Funds' general partners believe

that the value of the properties is insufficient to pay off the mortgage revenue bonds at that time. (Proxy 20)

6. AP CAPREIT is directly or indirectly owned by Apollo. (Willoughby Decl. ¶ 13)

through June 30, 1995 and (ii) CRIIMI MAE, Inc. ("CRIIMI MAE"), another CRI affiliate,[7] after June 30, 1995. The total accrued fees, assuming a timely closing, were $4.55 million of which, plaintiffs said at oral argument, CRI would receive approximately $4 million and CRIIMI MAE approximately $550,000.

Given the payments to the general partners, CRI and CRIIMI MAE, it appears that the initial merger agreement contemplated that the BAC holders would receive about $145 million in exchange for interests initially offered to the public for nearly $269.5 million.

The general partners of the Funds issued a press release on the day the merger agreements were signed which, it fairly· may be said, touted the deal. It pointed out that the offers "represent substantial premiums of approximately 20 percent over recent market prices" for the BACs, that the general partners had agreed to sell their own interests and had concluded that the offers were "in the best interests of the BAC holders," and that CAPREIT already managed most of the properties securing the bonds held by the Funds. (Schwartzberg Decl. Ex. 1)

By September 28, 1995, the Funds had prepared a draft proxy statement. It was shown to Schwartzberg at or about that time, but it never has been publicly disclosed other than as an exhibit to the plaintiffs' reply papers on this motion. In some respects, the draft was overtaken by events.

The announcement of the proposed mergers spawned class action suits brought in the Delaware Court of Chancery in late September and early October. Allegedly filed on behalf of BAC holders, the actions contended that the mergers were the product of self-dealing, that the prices were inadequate, and so on. The complaints sought to enjoin the mergers, to require arms-length negotiations to increase the prices, and to require evaluation of alternatives.[8] (Carter Decl. Ex. 4., at 39)

The merger announcement seems also to have coincided, at least roughly, with the start of the battle, of which this lawsuit is but a part, between Dockser and Willoughby, on one side, and Schwartzberg, on the other.

On October 3, 1995, Schwartzberg's counsel, who are well known for representing parties in, *inter alia*, corporate control contests, announced by letter to Dockser and Willoughby that they had been "retained as special securities and corporate litigation counsel." They asserted that their "preliminary investigation" supported Schwartzberg's belief that he had claims against Dockser, Willoughby, CRI and affiliates "in connection with an asset management agreement and other agreements, the Capital Housing Partnerships ('CHP') and the four public limited partnerships (CRI Ltd. I–IV), the CRIIMI–MAE proxy statement dated April 28, 1995, and the recently announced CRITEF disposition." They demanded production within ten days of a vast quantity of documents dating back for years. (Schwartzberg Decl. Ex. 3)

In about the same time frame, CRI questioned the level of CMS's compensation under Schwartzberg's 1990 consulting contract. When the parties failed to resolve their differences, CRI sued Schwartzberg in November 1995 in a Maryland state court for a declaratory judgment. (Willoughby Decl. ¶¶ 9–10)

The proposed mergers did not advance quickly. On December 13, 1995, the general partners of the Funds issued a press release stating that "material conditions to the mergers"—including settlement of the class actions—had "not yet been satisfied." They added, however, that they were in discussions with CAPREIT with a view to obtaining a new offer that would improve the terms for the BAC holders. (Schwartzberg Decl. Ex. 4)

---

7. CRIIMI MAE is a publicly held real estate investment trust originally sponsored by CRI. Dockser and Willoughby are officers, directors and major shareholders. They assert, however, that neither they nor CRI control it. (Carter Decl.Ex. 4, at 26–27; *id.* Ex. 5, at 19).

8. The filing and prompt settlement of such suits has become an almost omnipresent feature of major transactions involving public companies. Borden, *The Shareholder Suit Charade*, AM. LAW-YER 67 (Dec.1989).

These discussions culminated on January 31, 1996 in amended merger agreements that improved the terms of the of the proposed transactions by increasing the amount of cash to be received by BAC holders to $158.5 million (subject to certain adjustments), among other changes. (Willoughby Decl. ¶ 17) The revised deal was announced in a press release the following day, which noted also that the improved terms were the basis of an agreement in principle to settle the class action suits. (Schwartzberg Decl. Ex. 5)

### The Fight With Schwartzberg Heats Up

In the meantime, matters were developing on the Schwartzberg front.

In December 1995, Schwartzberg tried to negotiate a global settlement of his differences with Dockser and Willoughby. (Schwartzberg Dep. 234–35) The initial meeting allegedly ended with Willoughby getting red in the face and telling Schwartzberg that Willoughby is "richer, . . . smarter, . . . meaner, . . . [and] tougher" than Schwartzberg and that if Schwartzberg did "anything to tamper with CRI or any of our deals," Willoughby would kill him. (*Id.* 235) Nevertheless, discussions continued between Dockser and Schwartzberg for a few days. (*Id.* 235–49)

At some point in December, the talks broke down, and Schwartzberg soon thereafter began turning up the heat on Dockser and Willoughby. On January 17, 1996, he began soliciting consents from limited partners of the Capital Housing Partnerships ("CHPs"), a series of 125 real estate limited partnerships, to replace CRI as the managing general partner of the CHPs with himself. (*See* Schwartzberg Decl. Ex. 7; Cpt. Ex. A) On the following day, he sued Dockser, Willoughby and CRI in Maryland with respect both to the mergers and the dispute over the 1990 agreement. (Willoughby Decl. ¶ 11) And these were only opening shots.

On February 1, 1996, the same day that management announced the renegotiated deal with CAPREIT, Schwartzberg threw down another gauntlet. Already engaged in the solicitation of consents to remove CRI as

managing general partner of the CHPs, he demanded lists of the registered holders of the BACs "to permit [him] to communicate with the[m . . .] in connection with the replacement of [the relevant CRITEF Associates entity] as managing general partner . . ." of the Funds. (Willoughby Decl. Exs. F, G)

The effort to replace CRI affiliates as managing general partners of the Funds implicitly signaled Schwartzberg's opposition to the proposed mergers, as the consummation of the mergers would terminate the existence of the Funds and transfer ownership and control of their assets to CAPREIT. And the implicit rapidly became explicit.

### Schwartzberg's Press Releases

#### February 6, 1996

On February 6, 1996, Schwartzberg issued a press release, the bulk of which reported on the status of his efforts to oust CRI as managing general partner of the CHP partnerships, complained of CRI's attempted termination of his asset management contract, and characterized the actions of Dockser and Willoughby as "the worst kind of insider abuse," as well as "self-dealing." The release went on, however, to note that CRI had engaged in self-dealing in connection with the Funds and that Schwartzberg therefore had filed litigation and requested shareholder lists. In the passage central to plaintiffs' allegations, he stated:

> "Because the CRI principals stand to personally receive $9.3 million if the CRITEF–CAPREIT transaction is consummated, they have not conducted a public auction for the CRITEF properties or disclosed CRITEF's financial statements in order to prevent investors from determining the properties' true value and third parties from offering a higher price." (Cpt Ex. A)

The alleged $9.3 million benefit was not explained further.

#### February 14, 1996

On February 14, 1996, perhaps prompted by a litigation reverse [9] as well as the in-

---

9. The Circuit Court of Montgomery County, Maryland, in early February 1996, denied Schwartz-

creased CAPREIT offer for the Funds, Schwartzberg issued another release. (Cpt Ex. B) He charged again that CRI would receive $9.3 million in the transaction, stated that Schwartzberg was opposing the mergers "until CRI makes CRITEF's financial statements, and financial statements for each of the 18 properties, available to him," and urged "investors not to vote for the transaction until such time that the real values can be assessed." The release went on:

> "Mr. Schwartzberg said, 'While there appear to be many improprieties surrounding this transaction, I believe two continue to cry out for immediate correction: CRI, by its own admission, is attempting to 'cram down' this merger because its principals stand to benefit by an additional $4.55 million, on top of the $4.75 million they have already received from Apollo, if the CRITEF–CAPREIT transaction is consummated. Why hasn't CRI conducted a public auction for the CRITEF properties or disclosed CRITEF's financial statements? Is this an attempt to prevent investors from determining the properties' true value and third parties from offering a higher price? * * * I believe that CRI's principals want nothing else but to do a deal with CAPREIT so that they benefit by $9.3 million, even if it means that BAC holders do not get a fair price for their investment.' "

### The Factual Accuracy of the Press Releases

Plaintiffs charge that the press releases are materially false and misleading in three respects. They contend first that plaintiffs, contrary to the press releases, have disclosed the Funds' financial statements and financial information. Second, they charge that Schwartzberg's assertion that CRI will re-ceive or benefit by the $4.75 million redemption price if the mergers are consummated is false. Finally, they maintain that CRI, contrary to Schwartzberg's February 14 press release, will not receive the entire $4.55 million in accrued mortgage servicing fees. Of course, to the extent that plaintiffs prevail on the second and third points, they necessarily would establish the inaccuracy of the bald assertion that the CRI principals would receive a benefit of $9.3 million as a result of consummation of the mergers.

### Financial Statements

Both press releases accused the plaintiffs of refusing to disclose the Funds' financial statements. Both of the Funds are reporting companies under the Exchange Act. Both filed Quarterly Reports on Form 10-Q, which contain consolidated balance sheets and statements of operations, with the SEC for the quarter ended September 30, 1995 (*E.g.,* Carter Decl. Exs. 4–5) Hence, that assertion simply is false.

On the other hand, the assertion in the February 14 press release that plaintiffs have not publicly disclosed financial statements for each of the Funds' eighteen properties is literally correct. While the Funds' financial statements in their Form 10-Qs contain some information regarding individual properties,[10] plaintiffs acknowledged at oral argument that this summary data is less extensive than would be contained in statements for the properties. They offered no evidence that the information in the 10-Qs was their substantial equivalent.[11] (*See generally* Tr., Mar. 5, 1996, at 14–23)

Accordingly, the press releases were factually incorrect in charging that the plaintiffs had not disclosed the financial statements of

---

berg's motion for an injunction requiring CRI to continue paying CMS for its services as it had in the past and enjoined Schwartzberg from using in the proxy contest information derived from his position under the asset management contract. (Cpt Ex. C)

10. *E.g.,* Carter Decl.Ex. 4, at 37–38; *id.* Ex. 5, at 28.

11. Although the Court need not rely on it in view of plaintiffs' failure of proof, it appears that the financial statements for the individual properties would be useful in assessing the adequacy of the proposed merger prices whereas the income statements and balance sheets of the Funds would be of very little value. The Funds' balance sheets carry the underlying assets at their estimated values as of 1988 (Tr., Mar. 5, 1996, at 20–21; *see* Carter Decl.Ex. 4, at 29, 30; *id.* Ex. 5, at 20–21), which bear no necessary relationship to their current values. Nor do the Funds' financial statements reveal the gross revenues and the expense structures of the individual properties, which would be important in valuing the properties. (*Id.* at 18)

the Funds, but factually accurate in stating that they had not disclosed the financial statements of the eighteen properties held by the Funds. There is, however, another consideration bearing on the assertions regarding financial statements.

One general thrust of the press releases was that the Dockser–Willoughby interests were seeking to obtain approval of the mergers without disclosing to the BAC holders the information needed to evaluate the fairness of the proposed consideration. While it is true that the Dockser–Willoughby releases touted the mergers, particularly by emphasizing that the prices offered represented a premium over recent trading prices of the BACs, they have not yet actually solicited proxies in favor of the mergers. In order to do so, as Schwartzberg well knows, they will have to comply with the proxy rules, and thus to distribute to the BAC holders considerably more extensive financial information than has been made available to date. Hence, the Schwartzberg releases took advantage of the timing to charge management with withholding information that it was not yet obliged to disclose. In consequence, the releases were somewhat misleading in this broader sense, quite apart from their literal truth or falsity.

### The Alleged $9.3 Million Benefit

The February 6 release said, without elaboration, that CRI's principals stood to receive $9.3 million if the mergers were consummated. The February 14 release stated that this figure was the sum of $4.75 million already received from Apollo and $4.55 million that would be received, although it did not further explain these items. It now is clear, however, that Schwartzberg was referring to the $4.75 million the CRI Business received upon the redemption of its interests in CAPREIT and $4.55 million in payments contemplated by the original merger agreements for accrued mortgage servicing fees.

It is important at the outset to note that the basis for both of Schwartzberg's press releases was the September 28, 1995 draft proxy statement, which was a preliminary description of the initial deal. By the time Schwartzberg issued the press releases, however, the merger terms had been changed.

Schwartzberg knew they had changed, although he did not know the details of the changes. Yet he went ahead with his releases, knowing that he did not fully know the terms of the revised proposals.

### The $4.75 Million Redemption Price

As noted, the CRI Business transferred property management contracts on a number of properties, including thirteen of the eighteen securing the mortgages underlying the bonds owned by the Funds, to AP CAPREIT in February 1994 in exchange for limited partnership interests in CAPREIT. Those interests were redeemed on June 30, 1995 for $4.75 million, subject to the obligation of CRI to repay up to $3.55 million in the event some or all of those management contracts were terminated. The agreement provided also that the repayment obligation would be extinguished if the proposed mergers were consummated.

Schwartzberg contends that this arrangement gives CRI and its two stockholders, Willoughby and Dockser, a personal financial interest in the consummation of the mergers because that event would eliminate their contingent repayment liability. That appears to be correct. But Schwartzberg *may* have gone beyond the facts and significantly exaggerated the extent of the personal benefit.

The redemption transaction was not limited to the Fund properties. The amount of the contingent liability attributable to the Fund properties was only $1,313,864. (Carter Decl. Ex. 9, ¶ 5 & Ex. A) Hence, if one views the extent of the self-interest of Dockser and Willoughby in the mergers as the amount of the contingent liability that would be extinguished by consummation of the mergers, the $4.75 million figure used by Schwartzberg was a substantial exaggeration.

Schwartzberg has two responses to this argument. He views the entire redemption as part and parcel of an integrated transaction of which both the redemption and the mergers are a part. Put another way, he regards the whole $4.75 million redemption as a financial inducement to Dockser and Willoughby to push the mergers. He sought also at his deposition to make the case that,

on the basis of the information available to him at the time, he reasonably viewed substantially all of the repayment obligation as attributable to the Fund properties.

The Court need not and, in view of the limited record, cannot definitively resolve these questions at this time. The most that can be said at this point is that there is a fair ground for litigation as to whether the press releases were accurate in all material respects with regard to the redemption payment and any interest that may have given Dockser, Willoughby and CRI in the consummation of the mergers.

*The Mortgage Servicing Fees*

The balance of the $9.3 million figure mentioned in the press releases is the $4.55 million in allegedly accrued mortgage servicing fees payable on consummation of the mergers. As indicated above, the initial merger agreements contemplated the payment of approximately $4 million to CRI and approximately $550,000 to CRIIMI MAE, assuming a timely closing, in respect of allegedly accrued mortgage servicing fees.[12] The revised merger terms involve a payment of only $2 million in this regard to CRI. Plaintiff implied, but not stated, that no such payment is to be made to CRIIMI MAE.[13] (Willoughby Decl. ¶ 28) Those facts, however, were not disclosed in the plaintiffs' February 1, 1996 press release. (Schwartzberg Decl. Ex. 5)

Schwartzberg was well within the bounds of accuracy in suggesting that Dockser, Willoughby and CRI have individual financial interests in the consummation of the mergers by virtue of the proposed payments for ac-

crued mortgage servicing fees.[14] His press releases in this regard, however, were not entirely accurate. First, Schwartzberg ignored the fact that part of the $4.55 million contemplated by the original agreements was payable to CRIIMI MAE, despite the fact that the draft proxy statement he reviewed so indicated.[15] Far more important, he simply assumed—incorrectly—that the revision in the deal terms announced on February 1 made no change in this regard. Hence, although the plaintiffs' papers leave some uncertainty, it appears that Schwartzberg overstated the extent of the proposed payment in respect of the accrued fees by $2.55 million. If he did overstate it, he did so quite recklessly.

*Discussion*

■ Plaintiffs seek to enjoin defendant from conducting further solicitations without complying with Rules 14a–3 and 14a–6 and from making any further false and misleading statements in violation of Rule 14a–9. In order to obtain a preliminary injunction, they must show (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *E.g., Acquaire v. Canada Dry Bottling Co. of New York, Inc.,* 24 F.3d 401, 409 (2d Cir.1994); *ICN Pharmaceuticals, Inc. v. Khan,* 2 F.3d 484, 490 (2d Cir. 1993); *Holford USA Ltd. v. Cherokee, Inc.,* 864 F.Supp. 364, 371 (S.D.N.Y.1994). Moreover, a clear showing of a threat of irrepara-

---

**12.** Delay would increase the amount payable to CRIIMI MAE, but not that payable to CRI.

**13.** Willoughby states that the only potential payment to CRI or any of its affiliates in respect of the accrued fees is $2 million payable to CRI. (Willoughby Decl. ¶ 28) In view of plaintiffs' disclaimer of control over CRIIMI MAE, however, it is not clear whether Willoughby regards CRIIMI MAE as an affiliate. His declaration therefore leaves open the possibility that CRIIMI MAE also will receive such a payment.

**14.** As CRI is wholly owned by Dockser and Willoughby, it was not misleading to characterize the monies payable to CRI as an interest those individuals had in consummation of the mergers.

**15.** It is debatable whether this was material. Although the draft proxy statement did not disclose the breakdown of the $4.55 million between CRI and CRIIMI MAE, we now know from plaintiffs that nearly 88 percent would have been payable to CRI (and thus in substance to Dockser and Willoughby). Moreover, in view of the fact that Dockser and Willoughby are substantial shareholders in CRIIMI MAE, it is far from clear that use of the $4.55 million figure significantly overstated their personal interest in the payments for the accrued mortgage servicing fees that were contingent upon the mergers.

ble harm is essential. *E.g., Triebwasser & Katz v. American Tel. & Tel. Co.*, 535 F.2d 1356, 1359 (2d Cir.1976).

### The Merits

#### The Press Releases Were Solicitations

Section 14(a) of the Exchange Act provides in relevant part that:

"It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce ... or otherwise, in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe ... to solicit ... any proxy or consent or authorization in respect of any security ... registered pursuant to section 78*l* of this title." 15 U.S.C. § 78n(a).

Rules 14a–3 and 14a–6 thereunder provide in substance that no solicitation subject to Regulation 14A shall be made unless a preliminary or definitive proxy statement is filed with the Commission and each person solicited is provided with a copy concurrently with or in advance of the solicitation. Schwartzberg acknowledges that he neither filed nor disseminated a proxy statement. In consequence, the question whether Schwartzberg violated Section 14(a) and Rules 14a–3 and 14a–6 turns on whether the press releases were solicitations subject to Regulation 14A, 17 C.F.R. §§ 240.14a–1 *et seq.*

Rule 14a–1 defines "solicitation," with an exception to which the Court will turn below, to include, among other things, "[t]he furnishing of a ... communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy." 17 C.F.R. § 240.14a–1(*l*)(1)(iii). The Rule is declarative of the long established law of this Circuit, which holds that "solicitation" comprehends not only direct requests to furnish, revoke, or withhold proxies, but also "communications which may indirectly accomplish such a result or constitute a step in the chain of communications ultimately designed to accomplish such a result." *Long Island Lighting Co. v. Barbash*, 779 F.2d 793, 796 (2d Cir.1985); *accord, e.g., Securities and Exchange Commission v. Okin*, 132 F.2d 784,

786 (2d Cir.1943); *see generally* IV L. LOSS & J. SELIGMAN, SECURITIES REGULATION 1945–51 (3d ed. 1990) (hereinafter "LOSS"); Adopting Release at 48282 (apart from specific exceptions, general definition of solicitation remains unchanged).

■ These press releases easily meet the basic definition of solicitation. The sharp criticism of the CRI principals, the allegations of self-dealing, and the suggestion that CRI principals improperly sought to conceal important information relating to the mergers, along with the explicit urging that BAC holders "not vote for the transaction" until further information was provided, patently were designed to influence BAC holders to vote against the proposed merger. *See Kaufman v. Cooper Companies, Inc.*, 719 F.Supp. 174, 185 (S.D.N.Y.1989) (press release that spoke critically of incumbent management and gave reasons for formation of opposition, taken in context, was a step in a chain of communications that ultimately would seek proxies for upcoming annual meeting); *Canadian Javelin Ltd. v. Brooks*, 462 F.Supp. 190 (S.D.N.Y.1978) (mailings including articles unfavorable to management made during proxy fight constituted solicitations). Moreover, these press releases were parts of a broader campaign to supplant CRI and its affiliates as managing general partners not only of the CHPs, but of the Funds as well (*see* Schwartzberg Dep. 465)—the latter being a goal that, as a practical matter, can not usefully be accomplished unless the mergers are defeated.

Schwartzberg nevertheless argues that the press releases were not solicitations, relying on *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579 (5th Cir.), *cert. denied*, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974), and *Brown v. Chicago, Rock Island & Pacific R.R.*, 328 F.2d 122 (7th Cir.1964). Neither case, however, lends much support to his argument.

*Smallwood* held that a letter issued by management on the heels of a merger agreement, in advance of the filing of a proxy statement and well before the making of actual requests for proxies, did not constitute a "solicitation." 489 F.2d at 600–01. The case, however, involved the disclosure by the corporation of a material event and thus

reflected the importance of "[p]rompt disclosure ... to ensure not only that all investors, insiders and outsiders, have at all times equal access to market information ..." *Id.* at 600. It relied heavily on the fact that the letter merely described the merger proposal and stated that the boards believed the merger to be in the best interests of the shareholders, which the court took "to say only that the directors did their fiduciary duty." *Id.* at 601. Here, in contrast, Schwartzberg's press releases were not announcements by an issuer of material corporate events. The releases followed the announcement of the proposed mergers by months, not days. And they were issued only after settlement negotiations regarding an unrelated dispute between Schwartzberg and CRI interests broke down and Schwartzberg decided to seek consents to remove the CRI affiliates as the Funds' managing general partners. *Smallwood* therefore is of no help to Schwartzberg.

*Brown* is of no more aid. The Seventh Circuit there held only that a newspaper advertisement by one of two competing bidders to acquire a railroad was intended to generate opposition to an Interstate Commerce Commission application filed by the rival suitor and not to solicit proxies. *See* IV Loss at 1951 n. 80. The facts of the case bear no similarity to those at bar.

Schwartzberg's next and final line of defense to the Rule 14a–3 and 14a–6 claim focuses on the 1992 amendments to the proxy rules, which adopted a safe harbor provision that, in some circumstances, exempts press releases by security holders from the Rule 14a–1 definition of "solicitation" and, in consequence, from the proxy rules in general. The relevant language provides that the term "solicitation" does not apply to:

> "A communication by a security holder who does not otherwise engage in a proxy solicitation (other than a solicitation exempt under § 240.14a–2) stating how the security holder intends to vote and the reasons therefor, provided that the communication:
>
> > "(A) Is made by means of ... press releases ... [or]

> "(B) Is directed to persons to whom the security holder owes a fiduciary duty in connection with the voting of securities of a registrant held by the security holder ..." 17 C.F.R. § 240.14a–1(*l*)(2)(iv).

Before proceeding to detailed consideration of the provision, however, it is useful to understand the regulatory context in which it was adopted.

In 1989, the SEC began an extensive examination of the proxy rules with a view to determining whether they unduly interfered with the exercise of the corporate franchise, particularly in light of increased shareholder activism and more concentrated institutional ownership. Securities Exchange Act Rel. No. 34–29315, 56 Fed.Reg. 28987, 28987 (June 25, 1991) (hereinafter "Proposing Release"); Adopting Release, 57 Fed.Reg. at 48277. The result of this examination ultimately included both the exemption here at issue and an amendment to Rule 14a–2, which exempted from the proxy rules (other than the antifraud provisions of Rule 14a–9) certain communications with security holders by "disinterested" persons—those having no material economic interest (other than as a security holder) in the matter subject to security holder action—who do not seek proxies. Proposing Release, 56 Fed.Reg. at 28988, 28990. In general terms, the purpose of both changes was to eliminate unnecessary regulation of communication among security holders with respect to matters to be put to votes. More specifically, however, the goal of the safe harbor exemption upon which Schwartzberg relies was quite modest: "to eliminate any doubt that a shareholder can make a public announcement of how it intends to vote and provide the reasons for that decision without having to comply with the proxy rules." Securities Exchange Act. Rel. No. 34–30849, 57 Fed.Reg. 29564, 29566 (July 2, 1992).

Whether considered merely in terms of the plain language of the exemption or in the wider context of its history, Schwartzberg's contention that these press releases were not "solicitations" within the meaning of Rule 14a–1 is without merit for either of two independent reasons.

First, the sequence of events demonstrates that Schwartzberg was engaged in a proxy solicitation before issuing the first release. As already noted, his effort to defeat the proposed mergers is part of a broader plan which includes supplanting CRI and its affiliates as managing general partners of both the CHPs and the Funds. That campaign began in earnest no later than January 17, 1996, when Schwartzberg started soliciting consents with respect to the CHPs. It broadened to include the Funds no later than February 1, 1996—nearly a week before the first press release—when Schwartzberg demanded lists of BAC holders so he could communicate with them for the avowed purpose of replacing CRITEF Associates and CRITEF III Associates as their managing general partners. As consummation of the mergers would result in a change of control of the Funds to Apollo, Schwartzberg must defeat the mergers if he is to succeed in replacing the CRI entities as the managers of the Funds. In consequence, both of the press releases were steps in a chain ultimately designed to culminate in BAC holders voting against the mergers and voting for the replacement of CRITEF Associates and CRITEF III Associates as the Funds' managers.

Schwartzberg resists this conclusion, arguing that the consent solicitations with respect to the CHPs were not subject to Regulation 14A and that his demands for BAC holder lists were not communications disseminated to the BAC holders and therefore did not fall within the literal terms of Rule 14a–1($l$)(1)(iii). While his premises are correct, the Court cannot accept his conclusion.

Schwartzberg's argument presupposes that the phrase "otherwise engage in a proxy solicitation" as used in Rule 14a–1($l$)(2)(iv) refers to activities which, in and of themselves and thus without regard to the press releases, would constitute proxy solicitations subject to Regulation 14A. That, however, would be an untenable reading of the regulation. It would permit someone who had decided to wage a proxy contest and who had made extensive preparations for doing so to inundate security holders with publicity designed to persuade them to vote as desired—

entirely free of the proxy rules—as long as the proponent (a) limited its activities to media described in Rule 14a–1($l$)(2)(iv)(A), and (b) did not issue other communications that in and of themselves constituted proxy solicitations. Thus, it would permit someone to wage the greater part of a hotly contested proxy fight entirely free of regulation, coming within Regulation 14A only at the point where a mailing or other communication directly seeking a proxy actually went to security holders, which might well be the last step in the campaign.

The Second Circuit long ago made plain that such facile efforts to circumvent the policies of the Exchange Act will not be permitted. The defendant in *Securities and Exchange Commission v. Okin*, 132 F.2d 784, the seminal case in this area, argued that a letter urging shareholders not to vote management proxies was not a solicitation, notwithstanding that the defendant intended to follow up the letter with his own solicitation. The Court rejected this contention, saying that it had no doubt of the Commission's power to regulate such letters. "[W]ere it not so, an easy way would be open to circumvent the statute; one need only spread the misinformation adequately before beginning to solicit . . ." *Id.* at 786.

So too here. To construe "otherwise engage in a proxy solicitation" as Schwartzberg suggests would allow one in Schwartzberg's position to "spread the misinformation adequately before beginning to solicit." The Commission certainly intended no such result. The far more rational reading of the rule is that one loses any possibility of coming within the 14a–1($l$)(2)(iv) safe harbor if the circumstances indicate that the press release or other communication at issue is a step in a campaign likely to end in the solicitation of proxies and, *a fortiori*, where as here the issuer of the communication already has taken concrete steps to prepare for such a solicitation.

This result is supported too by comparison of this safe harbor exemption with the Rule 14a–2 disinterested person exemption promulgated by the Commission at the same time in consequence of the same general concerns. Two characteristics of the Rule

14a–2 exemption, 17 C.F.R. § 240.14a–2(b), are especially noteworthy: (1) it does not exempt the security holder from the antifraud provisions of Rule 14a–9, and (2) one who relies upon Rule 14a–2(b)(1) for exemption is "deemed to have made an irrevocable election to maintain exempt status throughout the relevant soliciting period." Adopting Release, 57 F.R. at 48281. Thus, under Rule 14a–2, the disinterested person exemption does not remove otherwise exempt communications from the antifraud rules. Nor may it be used to pave the way for a regulated solicitation; one either must (1) rely on the exemption and remain out of the fray, or (2) comply fully with the proxy rules from the start. It simply is inconceivable that the Commission intended to permit use of the 14a–1 safe harbor to accomplish precisely what it so clearly prohibited in the disinterested person exemption. Yet that would be the result of adopting Schwartzberg's proposed interpretation of Rule 14a–1(*l* )(2)(iv).

The Court must bear in mind that care must be taken "in deciding cases [to] contribute to the logical growth of regulation of the securities market ... [and that t]he securities laws are intended to protect investors, not merely to test the ingenuity of sophisticated corporate counsel." *Smallwood*, 489 F.2d at 592. Accordingly, the Court holds that Schwartzberg was otherwise engaged in a proxy solicitation within the meaning of Rule 14a–1(*l* )(2)(iv) and therefore did not come within the safe harbor.

The safe harbor does not apply here for a second and independent reason. Even if Schwartzberg were not otherwise engaged in a solicitation, the press releases were not confined to stating how Schwartzberg intended to vote on the proposed mergers and giving his reasons. Both releases accused the CRI principals of self-dealing in connection with the Funds. The February 6 release telegraphed Schwartzberg's intention to wage a contest to replace the managing general partners of the Funds by discussing his request for BAC holder lists. Both releases accused CRI and its affiliates of withholding information important to evaluating the proposed mergers. The February 14 release explicitly urged investors "not to vote for the transaction" until allegedly concealed financial information was made available. The releases went well beyond the safe harbor. *Cf. Krauth v. Executive Telecard, Ltd.*, 870 F.Supp. 543, 547 (S.D.N.Y.1993) (letters urging shareholders to withhold vote pending receipt of management proxy material constituted a solicitation).

Accordingly, plaintiffs have established a strong likelihood of success on their claim that the press releases constituted proxy solicitations made in violation of Section 14(a) and Rules 14a–3 and 14a–6 thereunder.

*The False Statement Claims*

■ Rule 14a–9, 17 C.F.R. § 240.14a–9, provides in relevant part that:

"No solicitation subject to this regulation [14A] shall be made by means of any ... communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading ... "

Hence, a materially false or misleading solicitation violates the Rule, provided the maker of the statement is at least negligent. *Wilson v. Great American Industries, Inc.*, 855 F.2d 987, 995 (2d Cir.1988). The test of materiality is whether " 'there is a substantial likelihood that a reasonable shareholder would consider [the misstatement or omission] important in deciding how to vote.' " *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090, 111 S.Ct. 2749, 2757, 115 L.Ed.2d 929 (1991) (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)); *United Paperworkers International Union v. International Paper Co.*, 985 F.2d 1190, 1198 (2d Cir.1993). In the case of omissions, the issue is whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Industries, Inc.*, 426 U.S. at 449, 96 S.Ct. at 2132.

*Financial Statements*

■ As noted, the assertion that the plaintiffs had refused to disclose the Funds' financial statements was literally false in view of the fact that the Funds in fact had filed financial statements with the SEC in their Form 10–Qs. It was false too in the sense that the releases implied that the plaintiffs were seeking to obtain approval of the mergers without providing financial statements for the Funds, which of course they had not done and could not lawfully do in view of the requirement of Rule 14a–3 that such financial statements be furnished at or before the time proxies are sought in favor of the mergers. 17 C.F.R. § 240.14a–3(b). Similarly, while the releases were accurate in accusing the plaintiffs of not having disclosed financial statements for the individual properties, they failed to indicate that the Funds had not yet filed a proxy statement, that the proxy statement would contain more information than the management press releases, and that management had not as yet actually sought anyone's proxy in support of the mergers. Thus, the overall impression was misleading.

A good deal, perhaps all, of this would have been apparent to many investors, who would have been well aware of the requirement of management proxy statements not to mention annual and quarterly reports containing financial statements that they undoubtedly had received from the Funds in the past. Nevertheless, given the presentation of Schwartzberg's charges in the context of broader allegations of misconduct and self-dealing, the question whether there is a substantial likelihood that the misstatement and misleading impression created by the releases with regard to financial information would be viewed by reasonable investors as important presents a fair ground for litigation. Since Schwartzberg undoubtedly knew both that the Funds' financial statements had been filed with the SEC and that proxy statements with detailed financial information would be forthcoming before proxies were requested in favor of the mergers, plaintiffs are likely to establish that he acted with the requisite culpability.

*The Alleged $9.3 Million Benefit*

As indicated above, there appears to be room for debate as to the accuracy of the press releases with regard to the $4.75 million redemption payment and as to Schwartzberg's culpability concerning any material inaccuracy in that regard. It is quite likely, however, that he exaggerated the extent of the proposed payment in respect of allegedly accrued mortgage servicing fees by $2.55 million. Moreover, the exaggeration, if exaggeration there was, appears to have been culpable. Schwartzberg based his $4.55 million figure, and thus the $9.3 million total, on the September 28, 1995 draft proxy statement despite the fact that the knew that the deal had changed on February 1, 1996. He thus went ahead with his allegation in the knowledge that he did not know the altered terms of the deal.

Materiality presents a somewhat closer question. Schwartzberg's overall thrust— that Dockser, Willoughby and CRI have a separate financial interest in the consummation of the mergers—appears to be correct. At a minimum, the mergers would eliminate a $1.3 million contingent liability with respect to the redemption transaction and result in the payment of $2 million in allegedly accrued mortgage servicing fees to CRI, which is wholly owned by Dockser and Willoughby. The problem is that Schwartzberg appears to have overstated the extent of the self interest, perhaps by millions of dollars. While there is much to be said for the proposition that the sting of the charge was the apparently accurate allegation of a self interest in a seven figure amount, as distinguished from the precise measure of that self interest, the possible size of the overstatement is so great that the issue of materiality easily presents a substantial ground for litigation.

*The Equities*

■ Having concluded that plaintiffs have made a sufficient showing on the merits, the Court turns to the questions of irreparable injury and the balance of hardships. In doing so, however, it is important to bear firmly in mind that the purpose of injunctions is "to deter, not to punish," and that "[t]he essence of equity jurisdiction has been the power of the Chancellor to do equity and to

mould each decree to the necessities of the particular case." *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 61, 95 S.Ct. 2069, 2077, 45 L.Ed.2d 12 (1975) (quoting *Hecht Co. v. Bowles,* 321 U.S. 321, 329–30, 64 S.Ct. 587, 591–92, 88 L.Ed. 754 (1944)) (upholding denial of injunction despite finding of securities law violations). Even proof of a violation of the securities laws at trial does not automatically warrant the issuance of an injunction; the plaintiff must establish also a likelihood that future violations will occur absent such relief. *E.g., Securities and Exchange Commission v. Bausch & Lomb Inc.,* 565 F.2d 8 (2d Cir.1977) (upholding denial of permanent injunction absent proof of likelihood of future securities law violations). *A fortiori,* a preliminary injunction will not issue simply on a showing that the defendant probably, or may have, violated the securities laws in the past.

 Schwartzberg argues that there is no threat of irreparable injury here and that the balance of hardships does not favor the plaintiffs. No proxies yet have been solicited. The vote on the mergers is weeks and perhaps months away. There is plenty of time for management to answer the statements in Schwartzberg's press releases that it considers false or misleading. Although he does not mention the point, there is precious little evidence that the press releases have received much attention.[16] The principal effect of a preliminary injunction, he argues, therefore would be to give the Dockser–Willoughby interests a club with which to beat him in the developing contest. He argues that it would be inequitable to facilitate their branding him a securities law violator, implying that this is particularly so in view of their use of their own press releases to tout the mergers and "condition" the electorate for the vote.

There is a good deal to Schwartzberg's argument. Given that Schwartzberg's releases appear not to have been distributed widely and the length of time remaining before formal solicitation, let alone the vote, even begins, corrective disclosure—a frequent remedy in proxy and tender offer disclosure cases—would be an overreaction, perhaps even drawing more attention to the allegedly misleading statements than they received in the first instance.[17] So the question is whether there is sufficient risk that Schwartzberg will commit future violations to warrant a "go and sin no more" injunction. Although the issue is a close one, two facts persuade the Court that such an injunction is appropriate.

First, there are two aspects of the press releases that point strongly to the conclusion that Schwartzberg has acted in reckless disregard of the truth. Schwartzberg must have known that his accusation that the Funds had withheld their own financial statements was false. Even assuming that he meant to refer only to the financial statements for the individual properties,[18] he wrote with disquieting lack of attention to the facts. Even more disturbing, both releases trumpeted the $9.3 million figure, and the February 14 release spoke also of $4.55 million in mortgage servicing fees, despite the fact that Schwartzberg knew that the deal had changed, but did not know whether the changes had affected the accuracy of these accusations. The Court appreciates that Schwartzberg's fundamental complaint—that the mergers involve self-dealing by the Dockser–Willoughby interests—appears to have a basis. It appreciates also that personal feelings in this matter run strong. But while a legitimate grievance or personal animus may explain exaggeration

---

**16.** The releases went to the PR Newswire, which is an electronic means of distributing corporate press statements to subscribers. There is no suggestion that the releases were picked up by any print or other media read by appreciable numbers of ordinary investors, as opposed to investment professionals. The only evidence that anyone other than the plaintiffs saw them is a statement by Willoughby that calls have been received from brokers and others in the financial community. (Willoughby Decl. ¶ 31) He did not indicate how many calls there were.

**17.** Plaintiffs, in apparent recognition of this fact, have not sought such relief.

**18.** That assumption perhaps is appropriate in the case of the February 6 press release, which spoke only of financial statements in general. It is much harder to indulge in it with respect to the February 14 press release, which referred specifically to financial statements both for the Funds and for the individual properties.

and disregard for the facts, neither justifies it. Further, these sentiments, which persist, suggest that the possibility of future violations is higher than otherwise might be the case. The Court therefore concludes that there is a reasonable likelihood of future violations absent an injunction, violations which would threaten irreparable injury should they occur. Moreover, the balance of hardships in this regard tips decidedly in favor of the plaintiffs, as the terms of the injunction that will issue will require Schwartzberg to do no more than comply with rules that he is obliged to follow in any case.

This conclusion is confirmed by the fact that the apparent violation of Rules 14a–3 and 14a–6 was a clear one. Schwartzberg's effort to defend the failure to file and disseminate proxy statements under the traditional definition of "solicitation" is weak, and his reliance on the safe harbor exemption entirely misplaced for the reasons already stated. While the high likelihood of a past violation does not itself warrant an injunction, the fact that the apparent violation was such a clear infraction does suggest a degree of lack of care or disregard that makes a future violation more than a speculative possibility. Moreover, an injunction precluding Schwartzberg from conducting further solicitations absent compliance with Regulation 14A seems appropriate in the circumstances. Schwartzberg is engaged in a campaign on a broad front—the CHPs, the management of the Funds, and the proposed mergers. The CHP battle is taking place in an exempt arena. The others are not. The possibility that Schwartzberg will be tempted, as he was in the case of the February 6 press release, to use a development or tactic relevant to one of the battle fronts to pursue an advantage in another—which in itself is not necessarily inappropriate—seems appreciable. There is, in consequence, a non-trivial risk that activities constituting non-exempt solicitations will occur without the filing of an appropriate proxy statement. Taking this risk together with the high likelihood that plaintiffs will prevail on their 14a–3 and 14a–6 claims and the fact that Schwartzberg would suffer little

harm from being required to file a proxy statement, the Court will grant an appropriate preliminary injunction in that respect.

### Conclusion

For the foregoing reasons, plaintiffs' motion for a preliminary injunction is granted to the extent that the defendant is enjoined, pending the hearing and determination of this action, from (1) making any solicitation within the meaning of Rule 14a–1($l$)(1), without regard to Rule 14a–1($l$)(2)(iv),[19] without complying with the provisions of Regulation 14A under the Securities Exchange Act of 1934, and (2) committing any violation of Rule 14a–9 in connection with any solicitation relating to the Funds. This injunction is conditioned upon plaintiffs' posting a bond or other sufficient security in the amount of $1,000 on or before March 22, 1996.

The foregoing constitute the Court's findings of fact and conclusions of law, FED. R.CIV.P. 52.

SO ORDERED.

---

**19.** Inasmuch as the Court has determined that defendant is "otherwise engaged" in a proxy solicitation, the safe harbor exemption is not available to him.