**CAPITAL REAL ESTATE INVESTORS TAX EXEMPT FUND LIMITED PARTNERSHIP, et al., Plaintiffs,**

v.

**Martin C. SCHWARTZBERG, Defendant.**

No. 96 Civ. 1186 (LAK).

United States District Court,
S.D. New York.

April 23, 1996.

David N. Wynn, Robert B. Hirsch, Howard V. Sinclair, Hunter T. Carter, and Nancy S. Appel, Arent Fox Kintner Plotkin & Kahn, New York City, for Plaintiffs Capital Realty Investors Tax Exempt Fund Limited Partnership and Capital Realty Investors Tax Exempt Fund III Limited Partnership.

Deborah L. Thaxter, Kevin J. Handly, Sigmund J. Roos, and Elizabeth M. Rice, Pea-

body & Brown, Boston, MA, for Plaintiffs CRITEF Associates Limited Partnership, CRITEF III Associates Limited Partnership, and C.R.I., Inc.

Marc Cherno, Audrey M. Samers, and Yasho Lahiri, Fried, Frank, Harris, Shriver & Jacobson, New York City, for Defendant.

KAPLAN, District Judge.

Plaintiffs Capital Realty Investors Tax Exempt Limited Partnership ("CRITEF") and Capital Realty Investors Tax Exempt Fund III Limited Partnership ("CRITEF III") (collectively the "Funds") are the subjects of proposed mergers with affiliates of Apollo Real Estate Acquisition Corporation ("Apollo"). The Funds and their principals are locked in a battle with defendant Martin C. Schwartzberg, one aspect of which is Schwartzberg's effort to block the mergers and to supplant the current managing general partners of the Funds. Both Schwartzberg and the Funds have filed preliminary proxy statements with the Securities and Exchange Commission ("SEC"), and a proxy fight is imminent.

On March 18, 1996, this Court granted plaintiffs' motion for a preliminary injunction, holding that two press releases issued by Schwartzberg in prior maneuvering between the parties constituted solicitations within the meaning of the pertinent SEC regulation and that they violated Rule 14a–9, 17 C.F.R. § 240.14a–9, the antifraud provision of the proxy rules. *Capital Real Estate Investors Tax Exempt Fund Limited Partnership v. Schwartzberg,* 917 F.Supp. 1050 (S.D.N.Y. 1996) (hereinafter *"CRITEF I"*). Schwartzberg now moves for a preliminary injunction against plaintiffs, arguing that press releases issued by the Funds in which they announced the proposed mergers and subsequent related developments were materially misleading solicitations also in violation of Rule 14a–9.

## Facts

The broad outlines of the dispute are covered in some detail in *CRITEF I,* familiarity with which is assumed, and need not be repeated. Only those facts immediately relevant to the determination of the issues presented by this motion need be sketched.

## The Funds' Press Releases

### The September 11 Release

The agreements to merge were entered into on September 11, 1995, and the Funds issued a press release announcing the proposed transactions on the same day. The release described the proposed merger terms and then went on as follows:

"The merger offers represent substantial premiums of approximately 20 percent over recent market prices for interests in the partnerships. The general partners of the CRITEF partnerships have agreed to sell their own interests in the partnerships to the CAPREIT subsidiary and they recommend that the CRITEF BAC holders approve the transaction with CAPREIT. The CRITEF general partners have concluded that these transactions are in the best interests of the BAC holders. The general partners of the CRITEF partnerships are affiliates of CRI, Inc., a real estate investment firm. CRI chairman William B. Dockser said, 'We believe this is an excellent offer from a real estate company with a proven track record and substantial financial resources. The offering prices are substantially above the current American Stock Exchange trading prices and represent a timely opportunity for the BAC holders to realize today the full value in the CRITEF partnerships.' Dockser also said that the CRITEF general partners had engaged Oppenheimer & Co. to provide an independent opinion as to the merits of the offer." (Schwartzberg Decl.Ex. 3)

Thus, the release went considerably beyond announcing the proposed transactions and their terms. It promoted the deal to shareholders by (1) focusing on the premium over recent trading prices inherent in the proposed offers, (2) conveying the recommendation of the general partners that the mergers be approved, (3) expressing the general partners' opinion that the transactions were in the best interests of the BAC holders, and (4) announcing Dockser's personal belief that the offer was "excellent" and would permit BAC holders to realize "the full value" in the partnerships.

*The December 13 Release*

As *CRITEF I* describes, the proposed mergers did not proceed smoothly. Class actions challenging the proposed mergers were filed. *See CRITEF I*, 917 F.Supp. at 1054. The buyer did not quickly obtain financing. Moreover, it has come to light since the Court's prior decision that during October 1995, Oppenheimer & Co. ("Oppenheimer") advised plaintiffs that the proposed merger consideration "would not support a fairness determination by Oppenheimer." (Schwartzberg Decl.Ex. 2, at 25)

Against this background, the Funds issued a second press release on December 13, 1995. The release indicated that conditions to the consummation of the previously announced mergers had not been, and might not be, satisfied. Nevertheless, it stated that the general partners of the Funds were in discussions aimed at improving the terms of the deal. (*Id.* Ex. 4) No mention was made of Oppenheimer's refusal to render a fairness opinion on the deal as originally announced.

*The February 1, 1996 Release*

On January 31, 1996, the Funds and Apollo reached agreement on revised merger terms. On the following day, the Funds issued the third press release here at issue to announce the new deal. The release was spare, noting only that the new agreement improved the merger terms and that the transactions were subject to obtaining a favorable fairness opinion, review by the SEC of a proxy statement, and approval by the BAC holders at a special meeting. (*Id.* Ex. 5)

*Discussion*

Schwartzberg contends that the Funds' press releases were materially false and misleading because (1) the insiders knew, contrary to Dockser's statement, that the terms of the mergers as announced in the September 11 release did not yield "full value" to the BAC holders (2) they failed to disclose that Oppenheimer stated that it would not render a fairness opinion on the original merger terms, (3) they understated the extent of the

self interest of CRI, Dockser and Willoughby in the proposed mergers, and (4) they falsely represented that the general partners of the Funds recommended approval of the transactions, knowing that Schwartzberg opposed them. Before considering the merits of these claims, it is necessary to deal with plaintiffs' contentions that Schwartzberg lacks standing to sue under the proxy rules and that the Funds' press releases were not "solicitations" subject to Rule 14a–9.[1]

*Standing*

Plaintiffs challenge Schwartzberg's standing to bring this claim, arguing that he is not a BAC holder whose proxy is being solicited by the Funds. The argument is without merit.

Schwartzberg is locked in a contest with the Funds' management with respect to the mergers and, indeed, with respect to control over the Funds. He is both a general and a limited partner of CRITEF Associates, the managing general partner of and the owner of a 1.01 percent interest in CRITEF and thus has an economic interest in CRITEF similar to that of the BAC holders. Even more significant, he for all practical purposes is the only person situated and motivated to redress any violations of the proxy rules by plaintiffs' insiders. In these circumstances, Schwartzberg's standing, in the constitutional sense, cannot seriously be questioned. The existence of a "[c]oncrete injury, . . . actual or threatened," that is the touchstone of the existence of an Article III controversy[2] is too clear to warrant extended discussion.

The question whether a proxy contestant has an implied cause of action for injunctive relief under Section 14(a) of the Exchange Act is a more substantial question, but only slightly so. In *Piper v. Chris–Craft Industries, Inc.*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), the Supreme Court confronted the related question of whether a defeated tender offeror has an implied private cause of action for damages under Sec-

---

**1.** The Court of course applies the well established preliminary injunction standard, articulated in *CRITEF I*, 917 F.Supp. at 1055.

**2.** *Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 220–21, 94 S.Ct. 2925, 2931–32, 41 L.Ed.2d 706 (1974).

tion 14(e) of the Exchange Act, 15 U.S.C. § 78n(e). It began its analysis by adverting to the Court's inference of private causes of action with respect to antifraud provisions of the securities laws "even though the relevant provisions are silent as to remedies." *Piper,* 430 U.S. at 25, 97 S.Ct. at 941 (citing *J.I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964) (Exchange Act § 14(a) and Rule 14a–9) and *Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 169 n. 9, 30 L.Ed.2d 128 (1971) (Exchange Act § 10(b)). It justified these holdings by noting that private remedies may be implied in favor of the class intended to be protected by a statute "where congressional purposes are likely to be undermined absent private enforcement ..." *Id.* at 25, 97 S.Ct. at 941. It quoted with approval the *Borak* Court's statement that judicial relief will be available under Section 14(a) "where necessary" to protect investors. *Id.* (quoting *J.I. Case Co.,* 377 U.S. at 432, 84 S.Ct. at 1559) (emphasis in original). And while the *Piper* Court went on to hold that a defeated tender offeror does not have an implied right to sue for damages for violation of Section 14(e), it went out of its way to emphasize the "limited" nature of its holding, *id.* at 42 n. 28, 97 S.Ct. at 949 n. 28, and quoted approvingly Judge Friendly's observation that "in corporate control contests the stage of preliminary injunctive relief, rather than post-contest lawsuits, 'is the time when relief can best be given.'" *Id.* at 42, 97 S.Ct. at 949 (quoting *Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 947 (2d Cir.1969)). Thus, although a great deal of water has flowed over the dam with respect to the implication of private causes of action by federal statutes since *J.I. Case Co.* was decided, the Supreme Court has (a) adhered steadfastly to the view that there are implied causes of action for violation of the antifraud provisions of the securities laws where they are necessary to achieve Congress' remedial purposes, and (b) suggested that private injunctive actions are an appropriate vehicle for enforcing the antifraud provisions in the fast-paced world of corporate control contests. *See also Mobil Corp. v. Marathon Oil Co.,* 669 F.2d 366, 371 (6th Cir.1981) ("Issues such as incomplete

disclosure [in tender offers] ... can only be effectively spotted and argued by parties with complete knowledge of the target, its business, and others in the industry."), *cert. denied,* 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 691 (1982); *Crane Co. v. Harsco Corp.,* 511 F.Supp. 294, 300 (D.Del.1981) (rival "is the only party likely to possess timely knowledge of misrepresentations and thus the practical opportunity to enforce" the statutory scheme); *Humana, Inc. v. American Medicorp, Inc.,* 445 F.Supp. 613, 616 (S.D.N.Y.1977) ("Of course, the [action] furthers [the rival's] interest as well but the critical factor is not whether [the rival] may be benefited by the suit but whether the stockholders of the target company would be benefited...."); *cf. Consolidated Gold Fields PLC v. Minorco, S.A.,* 871 F.2d 252, 260 (2d Cir.) (upholding target company's standing to seek injunction barring takeover bid under the antitrust laws, in part because target companies are best situated to vindicate the public interests involved), *cert. dismissed,* 492 U.S. 939, 110 S.Ct. 29, 106 L.Ed.2d 639 (1989).

In arguing that Schwartzberg lacks standing or, more properly, that a proxy contestant cannot challenge its adversary's compliance with the antifraud rules, plaintiffs place principal reliance on *AMR Corp. v. UAL Corp.,* 781 F.Supp. 292 (S.D.N.Y.1992). In that case, plaintiff AMR, the parent of American Airlines, sought to enjoin the acquisition of Air Wis Services, Inc., a local carrier, by UAL, the parent company of American's rival, United Airlines. It contended, among other things, that the Air Wis–UAL joint proxy statement violated Rule 14a–9. Despite the fact that AMR had purchased 100 shares of Air Wis stock for the obvious purpose of obtaining standing to challenge the proxy disclosure, the Court held that AMR lacked standing to sue under Section 14(a) as a shareholder because its interest as a shareholder was incidental to its real purpose: to act as "a dog in the manger waiting to pick the bones of Air Wis should the proposed merger die as a result of its efforts." 781 F.Supp. at 295. But plaintiffs ignore the part of the decision far more germane to this case. In discussing the Sixth Circuit's holding in *Marathon Oil* that a competing tender

offeror has standing to seek injunctive relief under Section 14(e), Judge Martin carefully noted that a competing tender offeror has a far stronger claim to relief than one in AMR's position:

> "In the tender offer context, each of the competing tender offerors is holding itself out as willing to purchase stock of the shareholders whose shares are being solicited. Each is required to make accurate disclosure of relevant information and will suffer a direct and real injury if its adversary is permitted to solicit the purchase of the same shares on the basis of false and misleading information. Thus, each tender offeror is a real participant in the tender offer process regulated by Section 14(e), and recognizing their right to an implied cause of action does no violence to the case or controversy doctrine or to traditional notions of standing.
>
> "Here, American is at most an interested bystander." *Id.*

■ Schwartzberg's situation here is closely analogous to that of a competing tender offeror. He and the Funds' insiders are or, perhaps more properly, are about to be competing for proxies for and against the proposed mergers. Indeed, Schwartzberg is competing for a chance to wrest control of the Funds away from both the Funds' insiders and Apollo. He is required to make accurate disclosure of relevant information, a requirement that already has been enforced at the Funds' behest. He will suffer real injury if the insiders are permitted to solicit proxies on the basis of false and misleading information. He is a genuine participant in the proxy solicitation process, having already taken a strong position in opposition to the mergers and filed preliminary proxy material with the SEC. When these considerations are coupled with the practical reality that only persons in situations comparable to Schwartzberg can be expected to have the information, motivation and financing to vindicate the shareholders' (in this case, BAC holders) interests in fair and accurate disclosure, this Court holds that a participant in a proxy contest may sue for injunctive relief for alleged violations of the antifraud provi-

sion of the proxy rules and that Schwartzberg has standing in this case.

*Solicitation*

■ The next bone of contention is whether the Funds' press releases constituted "solicitations" subject to the proxy rules. The Court dealt with the issue when press releases constitute solicitations in *CRITEF I*, and no useful purpose would be served by repeating that discussion here. *CRITEF I*, 917 F.Supp. at 1058–62. Suffice it to say that a press release in ordinary circumstances is a solicitation within the meaning of the proxy rules if it may result, even indirectly, in the procurement, withholding or revocation of a proxy or if it constitutes "a step in the chain of communications ultimately designed to accomplish such a result." *Id.* at 1058 (quoting *Long Island Lighting Co. v. Barbash,* 779 F.2d 793, 796 (2d Cir.1985)). On this standard, the September 11 press release—which touted the deal and, indeed, explicitly recommended that the BAC holders approve the mergers—was a solicitation. The December 13 and February 1 releases also were "steps in a chain of communications ultimately designed to" result in BAC holder approval of the transactions. But the *Long Island Lighting* test and SEC Rule 14a–1, 17 C.F.R. § 240.14a–1, both of which are based on *SEC v. Okin,* 132 F.2d 784, 786 (2d Cir.1943), may not be applied uncritically to announcements by issuers of material corporate developments.

Listed companies are under specific obligations to alert the marketplace promptly to material corporate events such as proposed mergers. The Funds, for example, were required by the American Stock Exchange "to make available to the public information necessary for informed investing and to take reasonable steps to ensure that all who invest in [their] securities enjoy equal access to such information." AMERICAN STOCK EXCHANGE, LISTING STANDARDS, POLICIES AND REQUIREMENTS (1996) ("ASE LISTING POLICIES") § 401; *see also* NEW YORK STOCK EXCHANGE LISTED COMPANY MANUAL ("NYSE MANUAL") § 202.06.[3] Indeed, the ASE LIST-

---

**3.** The Exchange's rules must meet with the    SEC's approval under Section 19 of the Ex-

ING POLICIES require "immediate public disclosure of all material information" likely to have a significant effect on the price of the securities or to be considered important by a reasonable investor, including information regarding mergers and merger negotiations. ASE LISTING POLICIES §§ 401–02; NYSE MANUAL § 202.06(A).

If subjecting the release to Rule 14a–9 were the only consequence of concluding that an issuer's press release concerning a material corporate development is a solicitation, there could be no substantial objection. An issuer has no legitimate interest in publishing false and misleading press releases; such communications in any case frequently would be subject to the general antifraud constraint of Rule 10b–5.[4] But subjecting issuer releases to Rule 14a–9 would not be the only consequence of such a holding. The issuer would be subject to the full panoply of the proxy rules, including the requirements that a preliminary proxy statement be on file with the SEC prior to, and a preliminary or definitive proxy statement distributed to security holders with or in advance of, the issuance of the release or other communication. 17 C.F.R. §§ 240.14a–3, 240.14a–6. Such a conclusion inevitably would delay public announcement of material corporate events while preliminary proxy statements were prepared. Securities of the issuer would trade during a period in which securities holders would be ignorant of important information. The risk of leaks, selective disclosure, and insider trading would be enhanced substantially. Great care therefore must be employed in crafting a standard applicable to issuer releases.

The Second Circuit has not spoken to this issue and the case law in general is sparse. Perhaps the leading case is *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579 (5th Cir.), *cert. denied*, 419 U.S. 873, 95 S.Ct. 134, 42

L.Ed.2d 113 (1974). The issuer there published a press release announcing the basic terms of a proposed merger and mailed copies to its shareholders with a letter indicating that the board believed the merger to beneficial and recommending its approval by the shareholders. The Fifth Circuit held that the letter was not a "solicitation" and that Rule 14a–3 did not apply. Acknowledging the *Okin* standard, the Court relied upon the facts that subjecting such a communication to the proxy rules would interfere with the goal of prompt disclosure of material events, that the letter was distributed well in advance of any vote on the transaction, and that the letter in recommending the transaction said "only that the directors did their fiduciary duty." *Id.* at 600–01. There was no claim that the letter or the press release was misleading. In two other cases dealing with this issue, District Courts concluded that analogous letters did not constitute solicitations because the communications in question were not sent for the purpose of soliciting proxies, a focus on intent urged upon this Court by plaintiffs. *See Kass v. Arden–Mayfair, Inc.*, 431 F.Supp. 1037, 1046 (C.D.Cal.1977); *Gladwin v. Medfield Corp.*, No. 74–169(TH), 1975 WL 360, at *9–*10 (M.D.Fla. Jan 30, 1975).

Any announcement of a material corporate event for which the issuer ultimately will solicit proxies is "a step in the chain of communications ultimately designed" to result in the approval of management's proposed action by the security holders. In consequence, *Smallwood* correctly recognized that this broad standard does not help separate releases that merely convey material information to security holders and the marketplace from those that implicate the more specific concern of the proxy rules— ensuring that the stream of information to security holders who will vote on the transaction is both accurate and complete in all

---

change Act, 15 U.S.C. § 78s. *See, e.g., Higgins v. SEC*, 866 F.2d 47, 49 (2d Cir.1989).

**4.** From the standpoint of a private party, however, the question whether such a press release is subject only to Rule 10b–5 or to both Rules 10b–5 and 14a–9 may be significant. For example, a 10b–5 plaintiff must be a purchaser or seller of securities and establish a higher level of culpability than is required under Rule 14a–9. *Ernst &*

*Ernst v. Hochfelder*, 425 U.S. 185, 209 n. 28, 96 S.Ct. 1375, 1388 n. 28, 47 L.Ed.2d 668 (1976) (*scienter* requirements); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (purchaser-seller requirement). *See generally* 2 ALAN R. BROMBERG & LEWIS D. LOWENFELS, BROMBERG AND LOWENFELS ON SECURITIES FRAUD & COMMODITIES FRAUD §§ 6.5(200)– 6.5(221)(3) (2d ed. 1994) (hereinafter BROMBERG).

material respects. An undue focus on the issuer's subjective intent in communicating is not desirable either, as issuers have a legitimate concern with having clear guidance as to whether a given release is or is not within the proxy rules.

On the other hand, a *per se* exclusion of issuer press releases from the definition of "solicitation" would go too far because it cannot seriously be doubted that such press releases can serve to condition the corporate electorate in favor of the issuer's point of view. Press releases create impressions in the minds of those who read or learn of their contents. A security holder persuaded by an offer of a premium over market price and a strong recommendation by the issuer's management or board may well decide—quite rationally—that the cost in time and energy of reading the proxy statement when it eventually arrives simply is not worthwhile given the expected informational benefit. Thus, advocacy in a press release may well result in discouraging investors from reading the proxy statement and thus impede the full measure of communication that the proxy rules were designed to promote. Accordingly, what is required is a clear standard that accommodates the strong public interest in prompt disclosure of material corporate events and the undesirability of permitting such disclosures to be used to condition the corporate electorate to approve a proposed transaction, free of the safeguards of the proxy rules.

The proper treatment of press releases announcing material corporate events as to which proxies will be solicited is analogous to the issue of "gun jumping" under Section 5 of the Securities Act, 15 U.S.C. § 77e. IV LOUIS LOSS & JOEL SELIGMAN, SECURITIES REGULATION 1949–50 (3d ed. 1990) ("LOSS & SELIGMAN"). Section 5 prohibits, *inter alia,* the offering for sale of securities before a registration statement with respect to those securities is filed. The question therefore arises whether a public statement by an issuer anticipating a securities offering, which is made before the registration statement is filed, "jumps the gun" by "conditioning the market" and thus constitutes an offer. I LOSS & SELIGMAN 436–37.

While the gun jumping problem has a long history, *see generally* I LOSS & SELIGMAN 436–58, the aspect most pertinent here is the SEC's adoption of Rule 135, 17 C.F.R. § 230.135, and its history in this Circuit. Rule 135 recognizes the need of securities issuers to communicate with the public about anticipated offerings, as these are facts material to investors. So it exempts, for purposes of Section 5, from the definition of "offer" a notice of proposed securities offerings if the notice states that the offering will be made only by means of a prospectus and "contains no more than" bare bones information concerning the offering. *Id.* Notably, the Rule does not permit even the disclosure of the anticipated price (except in an offering to employees), let alone any recommendation or advocacy of the proposed offering.

In *Chris–Craft Industries, Inc. v. Bangor Punta Corp.,* 426 F.2d 569 (2d Cir.1970) (en banc), the Second Circuit held that Rule 135 means exactly what it says, and it did so for reasons pertinent here. The issue before the Court was whether a press release that announced a proposed exchange offer fell outside Rule 135, and therefore violated Section 5, because it stated that the securities to be offered would have "a value, in the written opinion of The First Boston Corporation, of $80 or more." *Id.* at 571. And the en banc Court held that the inclusion of the anticipated price "jumped the gun":

> "When it is announced that securities will be sold at some date in the future and, in addition, an attractive description of these securities and of the issuer is furnished, it seems clear that such an announcement provides much the same kind of information as that contained in a prospectus.
> * * * *
>
> "Moreover, it is reasonable to conclude that the assigning of a value to offered shares constitutes an offer to sell. One of the evils of a premature offer is its tendency to encourage the formation by the offeree of an opinion of the value of the securities before a registration statement and prospectus are filed. There is then no information on file at the SEC by which the Commission can check the accuracy of the information which forms the basis of

the offeror's estimate of value, and any offeree, such as the reader of a press release, is encouraged to form a premature opinion of value without benefit of the full set of facts contained in a prospectus." *Id.* at 574–75.

The analogy from *Chris–Craft* to this case is fairly direct. The Funds' September 11 press release went far beyond the sort of bare bones factual description of the proposed transactions that would have been comparable to the information permitted by Rule 135. By touting the offer as an opportunity to obtain "full value" and recommending it to the security holders, it encouraged the formation of opinions before a proxy statement was available containing information that the Commission has deemed important to security holders in exercising their franchise.[5] Accordingly, *Chris–Craft* supports the view that the September 11 press release was a "solicitation."

The tender offer rules furnish useful guidance as well. SEC Rule 14d–9, 17 C.F.R. § 240–14d–9, prohibits an issuer whose securities are the subject of a tender offer from making any solicitation or recommendation with respect to the offer unless the issuer files a Schedule 14D–9[6] with the SEC "as soon as practicable on the date such solicitation or recommendation is first published or sent or given to security holders...."[7] The purpose, of course, is to ensure that certain basic information is publicly available to enable security holders and investors to evaluate the solicitation or recommendation. The tender offer rules therefore also support the view that the proxy rules should be construed in a manner that would bring within

their ambit the sort of advocacy engaged in by the Funds in the September 11 release.

The Funds counter that the press releases were issued pursuant to their obligation to the American Stock Exchange to disclose material corporate events promptly. But they are mistaken in their view of their obligations. The ASE LISTING POLICIES do not require that announcements of major events on which proxies will be solicited include management or board recommendations or subjective evaluations of proposed transactions. They merely require announcements to "be factual, ... balanced and fair ..." *Id.* §§ 403(a)(i), 403(a)(iii). While they mandate immediate public disclosure of material information, they proscribe "promotional disclosure activity which exceeds that necessary to enable the public to make informed investment decisions." *Id.* § 401(e). Thus, the Funds could have complied with the requirements of the American Stock Exchange without touting the proposed mergers as they did in the September 11 press release.[8]

■ Drawing these strains together, the Court concludes that the appropriate line falls between a purely factual description of the proposed transaction, perhaps coupled with a statement that the issuer's position and more information will be forthcoming in a proxy statement, and a more commendatory or subjective presentation. Such a standard serves the public interest in the prompt communication of material information by freeing descriptive factual announcements from the strictures of the proxy rules. It enables issuers to comply with their disclosure obligations to the American and other stock exchanges. It has the virtue as well of

---

**5.** Schedule 14A, 17 C.F.R. § 240.14a–101, which prescribes the form and content of a proxy statement, requires extensive disclosure including, of particular significance to this case, information concerning the background of the transaction and any conflicts of interest. Items 5, 14.

**6.** The Schedule 14D–9, 17 C.F.R. § 240.14d–101, requires extensive background information and compels the issuer making the recommendation to disclose "such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading."

**7.** The rule excludes, however, so-called "stop-look-and-listen communications"—communications identifying the tender offer, indicating that the offer is under consideration and the date by which the issuer will make any recommendation, and requesting security holders to defer accepting or rejecting the offer until they have been advised of the issuer's position. 17 C.F.R. § 240.14d–9(e).

**8.** The same is true of the New York Stock Exchange, which requires companies to present news "in proper perspective," that is, with "appropriate restraint" and "careful adherence to the facts." NYSE MANUAL § 202.06.

providing a relatively clear line. If the issuer makes a recommendation or makes other statements that reasonably portray the transaction in a favorable light—in other words, if it presents the transaction in a manner objectively likely to predispose security holders toward or against it—it must comply with the proxy rules. If it confines itself to the basic facts, it need not do so.

Measured by this standard, the September 11 press release was a "solicitation." It did not confine itself to a factual description of the proposed transactions. It portrayed the prices in a favorable light both by juxtaposing them with recent trading prices and by characterizing them as "full value." It explicitly recommended that BAC holders approve the mergers. It conveyed Dockser's favorable recommendation as well as the information that the general partners intended to sell their interests. All of this went beyond the Funds' obligations under the ASE LISTING POLICIES. All of it was likely to predispose security holders toward approving the transactions. All of it, in a word, was advocacy precisely of the sort that the proxy rules are designed to regulate.

The December 13 and February 1 releases yield a different conclusion. Both of course were steps in a chain designed to culminate in BAC holder approval of the proposed mergers, but both were materially more restrained than the September 11 release. The December release spoke of negotiations designed to improve the prices, but reported also that conditions to the deals as originally announced had not been, and might not be, satisfied. Apart from repeating that the original deal represented prices about 20 percent higher than trading prices during the period prior to its announcement, information that was dated, there was no boosting of the transaction. Similarly, the February 1 release simply described the terms of the revised transactions, noted various conditions yet to be satisfied, and quoted Dockser as stating the obvious—that the new prices were higher than the old. Accordingly, Schwartzberg is unlikely to prevail on his

contention that these releases were "solicitations."

### Disclosure Claims

As noted, Schwartzberg makes four disclosure claims.

█ His first claim, that the release falsely stated that the Funds' general partners favored the mergers despite the fact that Schwartzberg opposed them, is without merit. The general partners of the Funds are CRITEF Associates LP ("CRITEF Associates") and CRITEF III Associates LP ("CRITEF III Associates"). C.R.I., Inc. ("CRI"), which is wholly owned by Messrs. Dockser and Willoughby, is the sole general partner of CRITEF III Associates and the managing general partner of CRITEF Associates. Schwartzberg, Dockser and Willoughby are general partners of the latter, but not the former. Given that CRI favored the transactions, Schwartzberg is unlikely to succeed in showing that the release was misleading on this point.

█ Schwartzberg's next claim relates to the alleged failure to disclose the extent of the self-interest of Dockser, Willoughby and CRI in the consummation of the mergers, a subject discussed at some length in *CRITEF I,* 917 F.Supp. at 1056–57, 1063. The alleged self-interest stems from two sources. First, CRI and others stood to receive $4.55 million in mortgage servicing fees [9] contingent upon the consummation of the mergers, as indeed the release disclosed. Second, Schwartzberg claims that the entire $4.75 million paid by an Apollo affiliate in February 1994 to redeem limited partnership interests owned by the Funds' insiders, a subject not mentioned in the release, in substance was a payoff to induce them to approve the mergers. Whether that is correct remains to be seen, although there is circumstantial evidence that makes this a fair ground for litigation. *CRITEF I,* 917 F.Supp. at 1057. But it is not disputed that the consummation of the

---

**9.** This figure was reduced when the transactions were renegotiated. *CRITEF I,* 917 F.Supp. at 1057.

mergers would relieve the Funds' insiders of a contingent liability to Apollo of $1,313,864,[10] *id.*, something that was not disclosed in the release. Thus, the Funds' September 11 press release understated the extent of the insiders' self-interest in the consummation of the proposed transactions by at least $1.3 million and perhaps as much as $4.75 million.

Rule 14a–9 requires disclosure of self-interest on the part of those taking positions with respect to matters on which proxies are solicited. The reason is obvious: a reasonable security holder would be likely to consider the self-interest important in determining how to vote. *E.g., Mendell v. Greenberg,* 927 F.2d 667, 674 (1990), *amended,* 938 F.2d 1528 (2d Cir.1990). If Schwartzberg can establish his contention that all or most of the redemption price reflects insider self-dealing, the non-disclosure almost surely would have been material. Even if it is only $1.3 million, and contingent at that, the issue of materiality presents a fair ground for litigation.

Schwartzberg next contends that the failure to disclose Oppenheimer's refusal in October 1995 to issue a fairness opinion with respect to the original merger terms violated Rule 14a–9, which specifically provides that "[n]o solicitation shall be made ... which omits to state any material fact ... necessary to *correct* any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter *which has become false or misleading.*" (Emphasis added) The short answer, however, is that there could have been no obligation to disclose Oppenheimer's action in the September 11 release because it had not yet occurred and it is unlikely that there was any obligation to do so later because the December 13 and February 1 press releases probably were not solicitations.

Schwartzberg's final claim is that the September 11 release was materially misleading in asserting that the proposed prices represented "full value" for the partnerships.

In *Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991), the Supreme Court noted that a statement of belief or of reasons for recommending a course of action may be "factual in two senses: as statements that the directors do act for the reasons given or hold the belief stated and as statements about the subject matter of the reason or belief expressed." *Id.* at 1092, 111 S.Ct. at 2758. Where an issuer recommends a course of action for a stated reason and the evidence then establishes that it did not act for that reason, it may be held liable. *Id.* at 1092–93, 111 S.Ct. at 2758. Moreover, even conclusory characterizations of merger terms as "fair" or "high" value imply the existence of a factual basis and thus "can be uttered with knowledge of truth or falsity just like more definite statements ..." *Id.* at 1093, 111 S.Ct. at 2758. Accordingly, the plaintiffs may be found to have violated Rule 14a–9 if there was no reasonable basis for their characterization of the merger consideration as reflecting "full value." [11]

Schwartzberg argues that there cannot have been a reasonable basis for the characterization because the Funds had not been shopped and no fairness opinion had been obtained as of September 11. Nonetheless, the proposed merger prices did reflect premiums over recent trading prices. In consequence, while there is fair ground for litigation on this issue, the Court cannot say that Schwartzberg is likely to prevail on it, at least at this stage of the case.

In sum, two of Schwartzberg's disclosure claims with respect to the September 11 press release present fair grounds for litigation, although one cannot say at this stage that he has a strong likelihood of success on either. The others claims do not appear to be substantial.

10. Plaintiffs characterize this aspect of their self-interest as merely a potential benefit, noting that the $1.3 million contingent liability would be payable only if the Funds were acquired by someone other than Apollo. Nevertheless, the elimination of a seven-figure exposure, even one that is only a potential liability, creates a conflict of interest for the Funds' insiders.

11. Schwartzberg has not argued that the press release falsely implied that the mergers were recommended *because* they provided an opportunity to realize "full value," as opposed, for example, to the benefits that the insiders stand to gain from their consummation.

*The Equities*

■ The consideration of the equities—the existence of a threat of irreparable injury and the balance of hardships—is informed here by the same principles applied in *CRITEF I*. Among these are the propositions that the purpose of equity is "to deter, not punish," and that the movant must establish a likelihood that future violations will occur absent the issuance of a preliminary injunction. 917 F.Supp. at 1063 (quoting *Hecht v. Bowles*, 321 U.S. 321, 329–30, 64 S.Ct. 587, 591–92, 88 L.Ed. 754 (1944)).

In *CRITEF I*, Schwartzberg made a persuasive argument against the issuance of a preliminary injunction notwithstanding the Court's finding that he probably violated Rules 14a–3, 14a–6 and 14a–9. The meeting remains well in the future. No proxies actually have been requested. Both contestants will disseminate proxy statements. Each can answer the other's assertions. Nevertheless, the Court was persuaded to issue a preliminary injunction against Schwartzberg because it seems likely that his violation of Rule 14a–9 reflected, at least in part, reckless disregard of the truth and the apparent violation of Rules 14a–3 and 14a–6 was clear. *Id.* at 1063–65.

All of the considerations previously advanced by Schwartzberg now argue against granting his application for a preliminary injunction directed to the plaintiffs, as do a number of additional factors. Unlike plaintiffs, Schwartzberg first sought court intervention long after the press releases of which he complains, a factor that undercuts his claim of irreparable injury. *See, e.g., Fabrication Enterprises, Inc. v. Hygenic Corp.*, 64 F.3d 53, 62 (2d Cir.1995); *Bear U.S.A., Inc. v. A.J. Sheepskin & Leather Outerwear, Inc.*, 909 F.Supp. 896, 903 (S.D.N.Y.1995). Events have progressed as well. The parties now have filed preliminary proxy statements with the Commission, and there is no suggestion that either of them is not in full compliance with the law, a fact which reduces the risk of further difficulty.

The plaintiffs argue as well that their conduct, even if it has not been above reproach, has been less culpable than Schwartzberg's, thus suggesting that they are less likely to violate the securities laws in the future absent an injunction. This argument, however, is persuasive only to a limited extent. The Funds' failure to disclose the full extent of the insiders' conflict of interest arguably violated well established antifraud principles of the securities laws, and almost certainly violated state fiduciary duties requiring full disclosure,[12] irrespective of whether the September 11 press release was a "solicitation" within the meaning of Rule 14a–1. Accordingly, it betrays a willingness to minimize or downplay, or an insensitivity to, conflicts of interest that plaintiffs are obliged to disclose fully and fairly to the BAC holders.

While plaintiffs' actions do suggest a risk of future violations sufficient to satisfy the threshold requirement of threatened irreparable injury, all of these considerations together counsel against the issuance of a preliminary injunction. Schwartzberg's likelihood of success is not sufficiently strong to obviate consideration, or diminish the importance, of the balance of the equities. Save for a point to be discussed momentarily, the balance of hardships does not tip decidedly one way or the other. The erroneous grant of such an injunction would subject plaintiffs to a "go and sin no more" injunction [13] which would impose no undue burden. On the other hand, the erroneous denial of such an injunction would have little impact on Schwartzberg, save for the point mentioned below. The scales simply do not tip decidedly either way.

There remains for consideration Schwartzberg's contention that an injunction is neces-

---

12. The Funds are organized under Delaware law, which holds that a fiduciary owes its *cestui que trust* a duty of complete candor. *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del.Sup.1983); *Lynch v. Vickers Energy Co.*, 383 A.2d 278, 281 (Del.Sup.1977); *Kahn v. Tremont Corp.*, 1996 WL 145452 *16 (Del.Ch. Mar. 21, 1996); *Kahn v. Roberts*, 1995 WL 745056 *8 (Del.Ch. Feb. 6, 1995). The measure of that duty is no less extensive than under the federal securities laws. *See, e.g., Lynch*, 383 A.2d at 281; *Tremont*, 1996 WL 145452 at *16.

13. Corrective disclosure would be inappropriate here for the same reasons relied upon in *CRITEF I*, 917 F.Supp. at 1063.

sary to "level the playing field." He points out, accurately, that plaintiffs are using this Court's decision in *CRITEF I* as a weapon to discredit Schwartzberg. He argues that he should be given a comparable public relations weapon, at least given the Court's finding that some of Schwartzberg's claims present fair ground for litigation.

Corporate control contests frequently are fought simultaneously on many fronts. Many implicate important federal interests under the securities, antitrust and other statutes. Litigation under those statutes therefore often is one of several theaters of combat. In consequence, judicial determinations in such contests often will have repercussions that affect other theaters.

While there is something to be said for Schwartzberg's argument—if both sides are tarred by injunctions under the securities laws, then the BAC holders may be less inclined to make decisions on the basis of which side can be portrayed as the wearer of the black hats and more inclined to make rational economic judgments about where their best interests lie—it is not something properly taken into account in making this decision. Courts are not well equipped, and certainly not empowered, to make judgments that lie within the expertise of public relations counsel. Their role and their expertise is limited to deciding the questions put before them, which often appear wearing gray, rather than black or white. The public relations implications of those decisions for the parties are not a proper concern of the Courts.

As the threat of irreparable injury and the balance of hardships do not warrant a preliminary injunction given the scope and extent of Schwartzberg's prospects for succeeding on the merits of his claims against plaintiffs, the motion for a preliminary injunction is denied.

The foregoing constitute the Court's findings of fact and conclusions of law.

SO ORDERED.