**In re DOW CORNING CORPORATION, Debtor.**

**Bankruptcy No. 95–20512.**

United States Bankruptcy Court,
E.D. Michigan,
Northern Division.

Nov. 12, 1998.

As Amended Dec. 28, 1998
and Jan. 25, 1999.

Barbara J. Houser, Dallas, TX, Craig J. Litherland, Houston, TX, David Ellerbe, Dallas, TX, Sheinfeld Maley & Kay, P.C., for debtor.

Donald S. Bernstein, Michael Flynn, Davis Polk & Wardwell, New York City, Sheryl L. Toby, Honigman Miller Schwartz & Cohn, Detroit, MI, for the Official Committee of Unsecured Creditors.

H. Jeffrey Schwartz, Benesch, Friedlander, Coplan & Aronoff, LLP, for the Official Committee of Physicians Claimants, Cleveland, OH, Kenneth H. Eckstein, Philip Bentley, Kramer, Levin, Naftalis, & Frankel, New York City, for the Official Committee of Tort Claimants.

Leslie K. Berg, Detroit, MI, Justice Dept., Office of the U.S. trustee.

### OPINION ON REQUEST FOR RESTRICTIONS ON CONTENT AND METHODS OF ANNOUNCEMENT OF FILING OF JOINT PLAN

ARTHUR J. SPECTOR, Bankruptcy Judge.

██ The Debtor and the Official Committee of Tort Claimants (TCC) filed a joint plan of reorganization and accompanying disclosure statement on November 9, 1998. During the many months of difficult negotiations leading up to this event, the Court required the parties to provide regular status reports on the progress of their mediation. One such status report took place during an October 15, 1998 hearing. At that time, the Debtor stated that it and the TCC hoped "to generate some good publicity" upon the filing of their joint plan. Statement of Barbara Houser, Transcript of Hearing, October 15, 1998 at 8–9.[1] That statement was evidently the impetus behind the decision of the Offi-

cial Committee of Unsecured Creditors (U/S CC) to file on October 20, 1998, the motion that is now before the Court. The motion is styled "Emergency Motion of the Official Committee of Unsecured Creditors for an Order Establishing Procedures With Respect to Any Media Campaign Launched Prior to the Approval of a Disclosure Statement With Respect to a Plan of Reorganization to be Filed by the Debtor and/or the Tort Claimants Committee." In its motion the U/S CC asks the Court to place limits upon the Debtor's and the TCC's ability to publicize their joint plan of reorganization prior to the Court's approval of the accompanying disclosure statement. For the reasons which follow, the Court entered an order on November 6, 1998, denying the motion.

### I. Introduction

In order to construct a foundational basis for its concerns, the U/S CC turned to the recent history of this case. On February 17, 1998, the Debtor submitted its Second Amended Plan of Reorganization. That plan is still on file and release of a decision on the adequacy of the accompanying disclosure statement has been deferred for months. Nonetheless, the U/S CC demonstrated that after filing that plan the Debtor not only issued press releases, but also sent its corporate jet and executives all over the country to talk up the plan's merits. Motion at 8–9. The U/S CC then noted the obvious: that press releases and comments made by corporate executives about the previous plan were necessarily incomplete. After all, there is no way that a one-page press release or a short (or even fairly long) interview with members

---

1. The full statement was:

> But the concern is, is obviously we hope to generate some good publicity as part of finally filing the proposed joint plan. [Transcript at 6–7].
> ****
> The concern that we have on behalf of Dow Corning and most specifically the people in the department of Dow Corning that deal with public relations is that the Monday, Tuesday of election week is a very difficult time. We'll get lost in the shuffle then. [Transcript at 7].
> ****

> [I]t would be better to wait until Wednesday, November 4th for a filing just so we don't get lost in the election issues. Because we obviously would like to think that this would generate some very positive press. [Transcript at 7].
> ****
> [W]e would like to beat the commencement of [Dow Corning management meetings] so that we would have senior officers of Dow Corning available to assist in the media coverage that we hope will be generated by the filing of the plan.... [Transcript at 8].

Response of the Official Committee of Physician Creditors at 2–3.

of the press can cover all of the details, caveats, conditions, and disclaimers contained in a plan which, with exhibits and attachments, was hundreds of pages long. The result, according to the U/S CC, was that incomplete, and therefore misleading, accounts of the previous plan were disseminated to the claimants.

The U/S CC contends that the media campaign described above was contrary to the goals of § 1125 and that if the "media efforts [expected to take place in connection with the joint plan] . . . are not sufficiently circumscribed and pre-vetted with the parties and the Court . . . significant problems [could occur] down the road." Motion at 4. For example, if the media efforts are later found to have been improper solicitations, it could lead to the disqualification of votes pursuant to § 1126(e). *Id.* The Official Committee of Physician Creditors (PCC) filed a concurring response in which it raised the possibility that improper solicitations could render the joint plan nonconfirmable by virtue of § 1129(a)(2) of the Bankruptcy Code. PCC's Response at 8. To avoid these problematic scenarios, the U/S CC asks the Court to require the Debtor and the TCC: "(i) to obtain the Court's prior approval, on notice to parties in interest, of the content of the materials to be released in connection with the filing of their plan; (ii) to present for review and approval to the Court, on notice to parties in interest, (a) an accounting of the monies to be expended on media efforts surrounding the filing of their plan and (b) a description of scope and nature of such media campaign." Motion at 4.[2]

In colloquy at the hearing on its motion, counsel for the U/S CC stated the committee's back-up position: if the Court is unwilling to place limits on the rights of the Debtor and the TCC to speak, then issue a gag order on all parties, prohibiting any of them from commenting on the terms of the plan until a disclosure statement is approved. The legality of litigation gag orders is not contested. Orders prohibiting parties and counsel from making public comments about ongoing litigation, though far from common, are enforceable under certain circumstances. *See* 75 Am.Jur.2d, Trial § 201. However, enforcing such a gag order in this case, with hundreds of thousands of parties and hundreds of counsel spread across not just the United States but the whole world, would be unbelievably onerous and impractical. For example, would counsel for the official committees—including the U/S CC—be prohibited from discussing the terms of the plan with their own constituents? If not, then where the constituents are so numerous and geographically diverse, would communication via public media violate such a ban?[3] Would an attorney who filed an appearance in this case as representing one or more tort claimants be prohibited from communicating with his or her clients about the merits of the plan? What about prospective clients? The ramifications of such a gag order make us shudder.

The Debtor and the TCC (Proponents) contend that, upon the filing of the joint plan, they have no intention of launching a massive media campaign that is intended "to solicit creditors' support." Joint Response at 3. The Proponents note, and probably correctly so, that the attraction of significant media

---

**2.** At the argument on the motion, all concerned agreed that what was being requested by motion was an injunction or other equitable relief. As such, F.R.Bankr.P. 7001(7) would seem to require that the U/S CC commence an adversary proceeding in order to obtain the relief it requested. Though this point was not raised by the Debtor or the TCC, this procedural miscue may constitute sufficient grounds for denying the U/S CC's motion. *See* 10 *Collier on Bankruptcy* ¶ 7001.08 at 7001–21 (15th ed. rev.1998) ("The failure to proceed by adversary proceeding in seeking an injunction may in and of itself result in denial of that relief, usually on the ground that the court's jurisdiction has not been properly invoked."). But not all courts require strict

adherence to this rule. *See id.* (Even though the party seeking injunctive relief has not commenced an adversary proceeding, "some courts, in the interests of economy of administration of justice, will address the merits and grant the relief where warranted."). We need not determine which judicial view is correct because in the end, we are denying the motion.

**3.** If not, then what's the purpose of the motion? If even under a total gag order, the TCC would be free to communicate with its hundreds of thousands of constituents through mass media, then there is nothing improper with its current plan to do so.

coverage will be "a natural consequence of the agreement between [the Debtor] and the [TCC] on the most contentious issues in this case." *Id.* at 1. Because of the anticipated media response, they claim that they "must be prepared to respond accurately and promptly to [the inevitable] media inquiries." *Id.* at 3. Accordingly, they intend to provide a press release that "will describe the salient provisions of the Joint Plan." *Id.* After that, representatives of the Proponents "will ... be available to respond to media inquiries concerning the content of the Joint Plan." *Id.* The Proponents assert that the purposes of these media efforts will be "to ensure that as many interested parties as possible are informed about the filing of the Joint Plan and to encourage their continued participation in this case." *Id.* They further state that they are mindful that § 1125(e) prohibits the solicitation of votes prior to court approval of a disclosure statement. *Id.* at 4. And they are "aware of the severe consequences of violating that prohibition." *Id.* For this reason, the Proponents state that the media communications "will include specific statements that the Joint Plan will be subject to the vote of creditors and that this Court must approve a disclosure statement before the [Proponents] can seek acceptance of the Joint Plan." *Id.* That said, the Proponents assert that media communications regarding the Joint Plan "will be informational, not solicitous" and that the motion should be denied. *Id.*

## II. First Amendment and Prior Restraint of Speech

■ Because the relief the U/S CC seeks is a classic prior restraint of speech, opposed by the incipient speakers, the Court is concerned about the First Amendment implications. The right of free speech is expressly protected by the First Amendment of the Constitution. It "rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public." 16A Am.Jur.2d, Constitutional Law § 453. Stated alternatively, "[b]y protecting

those who wish to enter the marketplace of ideas from government attack, the First Amendment protects the public's interest in receiving information." *Pacific Gas & Elec. Co. v. Public Utilities Comm'n of California,* 475 U.S. 1, 8, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986) (citing *Thornhill v. Alabama,* 310 U.S. 88, 102, 60 S.Ct. 736, 84 L.Ed. 1093 (1940)). This constitutional right extends to both corporations, like the Debtor, and associations of individuals, like the TCC. *See Pacific Gas & Elec.,* 475 U.S. at 8, 106 S.Ct. 903. "Society ... has a strong interest in the free flow of commercial information...." *Friedman v. Rogers,* 440 U.S. 1, 8–9, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979). Nevertheless, the Supreme Court has long determined that "[t]he Constitution ... accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n,* 447 U.S. 557, 562–63, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980); *see also Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 770, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).

■ Commercial speech that is false, deceptive, or misleading or that concerns illegal activity is not protected by the First Amendment. *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio,* 471 U.S. 626, 638, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985); *Central Hudson Gas & Elec.,* 447 U.S. at 566, 100 S.Ct. 2343; *Virginia State Bd. of Pharmacy,* 425 U.S. at 771, 96 S.Ct. 1817. As a result, "[t]he States and the Federal Government are free to prevent the dissemination of commercial speech" that is misleading or illegal. *Zauderer,* 471 U.S. at 638, 105 S.Ct. 2265. While commercial speech that is not misleading and does not concern unlawful activity is protected by the First Amendment, it may nevertheless be restricted if doing so serves "a substantial government interest, [but] only through means that directly advance that interest." *Id.; see also Central Hudson Gas & Elec.,* 447 U.S. at 566, 100 S.Ct. 2343.[4] In addition,

---

4. In *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 501–02, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996), the Court stated that when the restriction of truthful and non-misleading commercial speech does not serve a substantial government interest, such speech should receive protection essentially equivalent to noncommercial speech.

the means used to serve the substantial government interest cannot be "more extensive than is necessary." *Central Hudson Gas & Elec.*, 447 U.S. at 566, 100 S.Ct. 2343; *NLRB v. Midland Daily News*, 151 F.3d 472, 475 (6th Cir.1998).

If the Proponents' media communications constitute a solicitation, there is no question that it would be commercial speech that is potentially subject to prior restraint. In fact, a prior restraint on such speech has already been imposed by Congress through § 1125(b) of the Bankruptcy Code. 11 U.S.C. § 1125(b). This section expressly prohibits any "solicitation" for or against a proposed plan of reorganization prior to the bankruptcy court's approval of a disclosure statement. The constitutionality of this prohibition is not disputed by the parties. *Cf.* Statement of Richard Broude, counsel for The Dow Chemical Company, Transcript of Hearing, May 21, 1998 ("Under the old chapter 11 when there were no solicitation rules, people violated security laws all the time. In response thereto, Congress passed [section] 1125 which is a restraint on First Amendment free speech rights. That is its purpose, just as securities laws prevent certain contact being made before a prospectus is approved. I think that Congress has said that the only restraint is going to be on solicitation before a disclosure statement is approved."). However, if the proposed speech is non-soliciting in character, it is questionable whether, prior to the approval of a disclosure statement, such speech could be restrained by the Court without violating the First Amendment rights of the Debtor and the TCC.

To begin with, determining whether non-soliciting speech in connection with a chapter 11 plan is even commercial in character is not simple. *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 539, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) (Brennan, J., concurring) (Supreme Court cases "recognize the difficulty in making a determination that speech is either 'commercial' or 'noncommercial.' "). Commercial speech has been defined as speech "which does 'no more than propose a commercial transaction.' " *Virginia State Bd. of Pharmacy*, 425 U.S. at 762, 96 S.Ct. 1817 (quoting *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 385, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973)). Accordingly, the Supreme Court has traditionally limited the scope of commercial speech to speech that is "pure advertising—an offer to buy or sell goods and services or encouraging such buying and selling." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 792, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (Brennan, J., dissenting). The Court "ha[s] been extremely chary about extending the 'commercial speech' doctrine beyond this narrowly circumscribed category of advertising because often vitally important speech will be uttered to advance economic interest and because the profit motive making such speech hardy dissipates rapidly when the speech is not advertising." *Id.* And in *Virginia State Bd. of Pharmacy,* the Court explained that speech which is intended merely to either "editorialize on any subject, cultural, philosophical, or political" . . . or "to report on any particular newsworthy fact, or to make generalized observations even about commercial matters" is not commercial speech. 425 U.S. at 761, 96 S.Ct. 1817. All this suggests that non-soliciting communication is not commercial speech. This notion is supported by Congress' conscious choice to regulate what is clearly commercial speech (solicitation) in § 1125(b), and at the same time to place no restrictions on speech that does not rise to the level of a solicitation.

However, the Sixth Circuit has interpreted one Supreme Court case as expanding the definition of commercial speech to speech that merely promotes a product, as opposed to limiting it to speech that proposes a commercial transaction. *See Semco, Inc. v. Amcast, Inc.*, 52 F.3d 108 (6th Cir.1995) (interpreting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983)). In *Bolger*, the appellee was a manufacturer of contraceptives which undertook a campaign of unsolicited mass mailings to members of the public. The mailings, in part, consisted of pamphlets that were informational in nature and did not specifically mention the appellee's name. *Bolger*, 463 U.S. at 66 n. 13, 103 S.Ct. 2875. Stating that it was a close question, the Court held that when viewed as a whole the informa-

tional pamphlets constituted commercial speech because: they were advertisements; they referred to a specific product; and the manufacturer's motivation for mailing the pamphlets was economic. *Id.* at 66–67, 103 S.Ct. 2875. The Court was careful to note that taken individually, none of these three characteristics would have been sufficient to turn the pamphlets into commercial speech. *Id.*

The distinction between proposing a commercial transaction and merely promoting a commercial product seems rather vague. It is perhaps not surprising, then, that the Sixth Circuit interpreted *Bolger*'s definition of commercial speech broadly. *Semco,* 52 F.3d 108 (6th Cir.1995). In *Semco,* a manufacturer wrote an article discussing its history and products and submitted it for publication in a trade magazine. 52 F.3d at 110–11. A competitor brought suit against the manufacturer, alleging that the article was commercial speech [5] that contained misrepresentations in violation of the Lanham Act. *Id.* at 111. The manufacturer argued that the article was not an advertisement and therefore could not be commercial speech. *Id.* at 112–13.[6] However, the court suggested that not all of the elements identified in *Bolger* need be present for speech to be commercial and opined that even if the article was not an advertisement it could nevertheless be commercial speech. *Id.* at 113. Significantly, a determination of which of the three elements could be excluded from the formula was avoided when the court unequivocally decided that the article was an advertisement. *Id.*

The speech involved in *Semco* clearly was commercial speech as that term is defined in *Bolger.* However, we are not persuaded that *Bolger* truly expanded the definition of commercial speech beyond the one traditionally employed by the Supreme Court. Even if *Bolger* did broaden the term's meaning, we are even less convinced that it extends to the type of speech proposed here. Yet the par-

ties' argumentation on the motion proceeded on the assumption that the Proponents' proposed media communication will, even if it is not solicitation, nevertheless be commercial. Therefore, the following discussion will proceed on the same questionable assumption.

### III. Bankruptcy Case Law and Dictionary Definition

The U/S CC suggests that the type of communication which the Proponents will engage in is solicitation. The Proponents deny this. The term "solicitation" is not defined in the Bankruptcy Code. 7 *Collier on Bankruptcy* ¶ 1125.03[1][a] (15th ed. rev.1998) (citing *In re Snyder,* 51 B.R. 432 (Bankr.D.Utah 1985)). No one suggests that "solicitation" in § 1125(b) is so clear that it needs no construction. And, the place to start would seem to be with the dictionary definition of the term. *Bailey v. United States,* 516 U.S. 137, 144–45, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995) (turning, in the first instance, to the dictionary definition of a term in order to decipher its statutory meaning); *see also MCI Telecommunications Corp. v. AT & T Co.,* 512 U.S. 218, 225–26, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994).

> Black's Law Dictionary defines "solicit" as:
>
> To appeal for something; to apply to for obtaining something; to ask earnestly; to ask for the purpose of receiving; to endeavor to obtain by asking or pleading; to entreat, implore, or importune; to make petition to; to plead for; to try to obtain; and though the word implies a serious request, it requires no particular degree of importunity, entreaty, importation, or supplication.

Black's Law Dictionary 1392 (6th ed.1990). A lay dictionary defines "solicit" as "**1a:** to make petition to: ENTREAT **b:** to approach with a request or plea **2:** to strongly urge (as one's cause) **3a:** to entice or lure esp. into evil ... **4:** to try to obtain by usu. urgent

---

5. The Lanham Act actually uses the phrase "commercial advertising or promotion." 15 U.S.C. § 1125(a). However, the court relied on the fact that the House of Representatives had equated the phrase to the term "commercial speech." *Semco, Inc. v. Amcast, Inc.,* 52 F.3d 108, 111–12 (6th Cir.1995).

6. This assertion was particularly dubious since the manufacturer made copies of the published article and used them as promotional brochures—that is, advertisements—at trade shows. *Id.* at 111.

requests or pleas ..." Webster's Ninth New Collegiate Dictionary 1122 (1986).

■ It is apparent that "solicit" is an action verb. It implies that the solicitor is requesting the listener to take some action. And the adverbs and adjectives used in both dictionaries' definitions ("to ask *earnestly;*" "to *strongly* urge;" "*urgent* requests or pleas") suggest that it is action of some immediacy that is requested. Thus the lag time between the communication and the intended action is of special importance.

■■ While no case interpreting solicitation in § 1125(b) explicitly draws this distinction, most seem to support it.[7] Solicitation "[does] not encompass discussions, exchanges of information, negotiations, or tentative arrangements that may be made by the various parties in interest in a bankruptcy case which may lead to the development of a disclosure statement or plan of reorganization, or information to be included therein." *Snyder,* 51 B.R. at 437; *First Am. Bank v. Century Glove, Inc.,* 81 B.R. 274 (D.Del.) *modified sub nom. Century Glove, Inc. v. First Am. Bank,* 860 F.2d 94 (3rd Cir.1988). In other words, negotiation over the terms of a plan and disclosure statement do not violate the prohibition of § 1125(b). Rather, *solicitation "relate[s] to the formal polling process" through which plan acceptance or rejection is sought.* 7 *Collier on Bankruptcy* ¶ 1125.03[1][a] (emphasis added). Solicitation occurs only when a party in interest makes "a specific request for an official vote either accepting or rejecting a plan of reorganization." *Snyder,* 51 B.R. at 437; *see also Duff v. United States Trustee (In re California Fidelity, Inc.),* 198 B.R. 567 (9th Cir. BAP 1996). And typically it is not difficult to tell whether a "specific request" for a vote has been made. *Compare Snyder,* 51 B.R. at 437 (no solicitation occurred when debtor provided creditors with letter containing the terms of five alternate plans and invited their comments on the proposals); *with Duff,* 198 B.R. 567 (improper solicitation occurred when principal of debtor sent letter

to 300 creditors asking them to reject the plan); *In re Gilbert,* 104 B.R. 206 (Bankr. W.D.Mo.1989) (improper solicitation occurred when, prior to approval of disclosure statement, one creditor told second creditor that he hoped second creditor would approve plan); and *In re Nautilus of New Mexico, Inc.,* 83 B.R. 784 (Bankr.D.N.M.1988) (debtor solicited votes by convening meeting of creditors' committee without advising its counsel; showing its members excerpts from unfiled plan and disclosure statement; and threatening to take certain actions detrimental to those creditors if they did not accept the plan). Solicitation, then, is the process of seeking votes for or against a plan.

### IV. Securities Law Analogy

The U/S CC argues that neither the dictionary definitions nor bankruptcy case law provide a clear answer as to whether the proposed media communications are solicitations. In part, this is because every potentially relevant reported decision on § 1125(b) involved direct communication between a party in interest and a creditor, either verbally or in writing. None of the cases involved a communication conducted through the media. And no reported decision involved a request to restrain anticipated speech.

Due to the dearth of any applicable precedent, the U/S CC relies exclusively on injunction cases arising under the Securities Exchange Acts and regulations issued thereunder. *See, e.g., Chris–Craft Indus., Inc. v. Bangor Punta Corp.,* 426 F.2d 569 (2d Cir. 1970) (dealing with § 5(c) of the Securities Exchange Act of 1933, 15 U.S.C. § 77e); *Capital Real Estate Investors Tax Exempt Fund Ltd. P'ship v. Schwartzberg,* 917 F.Supp. 1050 (S.D.N.Y.1996) ("*Schwartzberg* I") (dealing with § 14a of the Securities Exchange Act of 1934, 15 U.S.C. § 78n); *Capital Real Estate Investors Tax Exempt Fund Ltd. P'ship v. Schwartzberg,* 929 F.Supp. 105 (S.D.N.Y.1996) ("*Schwartzberg* II "); *Cona-*

---

**7.** Case law on the meaning of "solicitation" for purposes of § 1125(b) is less than clear. Some courts have reportedly construed "solicitation" narrowly. 4 *Norton Bankruptcy Law and Practice 2d* § 91:17 at 91–47 to 91–48 & nn. 93–95

(1998). A lesser number of courts reportedly apply the term expansively. *Id.* at 91–49 & n. 96. However, it is often difficult to tell whether a court is applying a narrow or a broad interpretation.

*gra, Inc. v. Tyson Foods, Inc.*, 708 F.Supp. 257 (D.Neb.1989), *vacated,* 716 F.Supp. 428 (D.Neb.1989). According to the U/S CC, these cases stand for the proposition that providing even neutral information through press releases and the like can be considered "solicitation" for the purposes of the securities laws. By analogy, therefore, it argues that the Proponents' anticipated media campaign can likewise be considered "solicitation" for purposes of the Bankruptcy Code, which may be enjoined, or at least circumscribed with regulations. The analogy is justified, but the argument is ultimately unpersuasive.

### A. Purpose of The Disclosure Statement & § 1125(b)—Legislative History

The House Report to the Bankruptcy Reform Act of 1978 indicates that "[t]he premise of the bill's financial standard for confirmation is the same as the premise of the securities law: parties should be given adequate disclosure [and] relevant information, and they should make their own decision on the acceptability of the proposed plan [of] reorganization." H.R.REP. No. 95–595, at 224 (1977). It notes that:

> In consolidating the two reorganization chapters [X and XI], it [was] necessary to determine the extent of the disclosure to creditors and equity security holders required, and the extent of advance court determination of the propriety of the plan. *The premise underlying the consolidated chapter 11 of this bill is the same as the premise of the securities law. If adequate disclosure is provided to all creditors and stockholders whose rights are to be affected, then they should be able to make an informed judgment of their own, rather than having the court or the Securities and Exchange Commission inform them in advance of whether the proposed plan is a good plan.* Therefore, the key to the consolidated chapter is the disclosure section.

H.R.REP. No. 95–595, at 226 (emphasis added).

The Report further states that in providing proper disclosure to creditors and equity security holders, the drafters were mindful that a debtor in chapter 11 does not enjoy the financial ability to provide a detailed prospectus like those required under securities law, and that the debtor must work as expeditiously as possible. Accordingly, in determining what constitutes adequate information, the Report notes that a compromise or balance had to be struck between supplying the necessary information to creditors, while at the same time recognizing the unique status of a chapter 11 debtor:

> The bill also permits the disclosure statement to be approved without the necessity for compliance with the very strict rules of Section 5 of the Securities Act of 1933, section 14 of the Securities Exchange Act of 1934, or relevant State securities laws. Without such a provision, the court would have no discretion in approving disclosure statements that go to public classes, but would be required in every case to require a full proxy statement or prospectus whenever public classes were solicited. Such a statement requires certified audited financial statements and extensive information. The cost of developing a prospectus or proxy statement for a large company often runs well over $1 million. That cost would be nearly prohibitive in a bankruptcy reorganization. In addition, the information normally required under section 14 may simply be unavailable, because of the condition of the debtor. Finally, court supervision of the contents of the disclosure statement will protect the public investor from any serious inadequacies in the disclosure statement.

\* \* \*

> *Bankruptcy law cuts across many other areas of the law. In the interaction between bankruptcy law and other laws, each bends somewhat to accommodate the policies of the other. The disclosure provisions in the bill are a compromise between the strict requirements of the securities laws and the near-absolute freedom of the present bankruptcy laws. A compromise is essential.* If nothing is to change when a company becomes insolvent, then the bankruptcy laws can offer that company little help. The company would be no

better off proceeding under the bankruptcy laws than under generally applicable law. The compromise proposed in this [disclosure] section is a reasonable one that accounts for both the interest of the creditors in a successful reorganization, and the interest of the public in preventing securities fraud.

H.R.REP. No. 95–595, at 227–28 (emphasis added).

The Report then notes that in striking this compromise between the strict securities law disclosure requirements and the disclosure requirements provided for in the proposed bankruptcy bill, certain protections were created "so that the public [was] not left entirely at the mercy of the debtor and its creditors. First and most important, the court will be required to approve a disclosure statement before there may be any solicitation of acceptances or rejections of a plan." H.R.REP. No. 95–595, at 228. Specifically, the Report acknowledges that:

> [S]ection [1125(b) ] prohibits solicitation of acceptances or rejections of a proposed plan after the commencement of the case until after there has been transmitted to each holder of a claim or interest a disclosure statement approved by the court, after notice and a hearing, as containing adequate information. This prohibition is designed to protect against end-runs around the disclosure requirement.

*Id.* at 227. Summarizing the disclosure process, the Report states:

> The public protection policy of the securities laws must be balanced with the protection of creditors rights in bankruptcy cases, which is frequently facilitated by speed in the reorganization process. The bill attempts to provide that balance by having the judge rule on the adequacy of the disclosure statement before any [solicitations].

*Id.* at 229.

■ Clearly, then, the U/S CC was justified in looking to established precedent in the field of securities regulation for guidance on the meaning of "solicitation" in § 1125(b) of the Bankruptcy Code. We emphasize, however, that the legislative history of § 1125(b)

makes clear that while securities law may be looked to for guidance, it is not binding in the bankruptcy context. And in any event, securities law fails to provide an unequivocal answer.

## B. Securities Law Does Not Provide the Answer

Section 14(a) of the Securities Exchange Act of 1934 proscribes the solicitation of votes as follows:

> It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce . . . or otherwise, in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe . . . to solicit . . . any proxy or consent or authorization in respect of any security . . . registered pursuant to section 78*l* of this title.

15 U.S.C. § 78n(a). Rule 14a–1 defines "solicitation" to include, among other things, [t]he furnishing of a . . . communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy. 17 C.F.R. § 240.14a–1(1)(iii).

In *Schwartzberg I*, 917 F.Supp. at 1059, the defendant issued press releases that criticized proposed mergers and accused managing general partners of self-dealing. They also "urged 'investors not to vote for the transaction. . . .' " *Id.* at 1056. The court found that the press releases contained false and misleading statements. More materially, it held that the:

> press releases easily meet the basic [securities law] definition of solicitation, and therefore violated Section 14a of the Security Exchange Act of 1934. The sharp criticism of the CRI principals, the allegations of self-dealing, and the suggestion that CRI principals improperly sought to conceal important information relating to the mergers, along with the explicit urging that BAC holders "not vote for the transaction" until further information was provided, patently were designed to influence

BAC holders to vote against the proposed merger.

*Id.* at 1059.

In contrast to this holding was the court's pronouncement that the plaintiffs' own prior press release, "which, it fairly may be said, touted the deal," *id.* at 1054, did not amount to a solicitation. *Id.* at 1057 ("While it is true that the [plaintiffs'] releases touted the mergers, particularly by emphasizing that the prices offered represented a premium over recent trading prices of the BACs, they have not yet actually solicited proxies in favor of the mergers. In order to do so ... they will have to comply with the proxy rules, and thus to distribute to the BAC holders considerably more extensive financial information than has been made available to date."). Thus far, it would seem that the meaning of solicitation in securities law is essentially the same as the formulation posited above for bankruptcy. That is, solicitation is a direct request imploring the recipient of the message to take some sort of immediate action.

However, a month after *Schwartzberg I,* the court changed its mind and held that the plaintiffs' press releases were also solicitations. *Schwartzberg II,* 929 F.Supp. 105. The court thoughtfully analyzed the conflict between a company's duty to report material information on the one hand and its duty to refrain from making statements about such information which would tend to influence the public's investment activities on the other. It borrowed from the resolution of similar conflicts in the fields of "gun jumping" under Section 5 of the Securities Act[8] and tender offers. According to the court, the line which separates a solicitation from a non-solicitation:

> falls between a purely factual description of the proposed transaction, perhaps coupled with a statement that the issuer's position and more information will be forthcoming in a proxy statement, and a more commendatory or subjective presentation. Such a standard serves the public interest in the prompt communication of material information by freeing descriptive factual announcements from the strictures of the proxy rules. It enables issuers to comply with their disclosure obligations to the ... stock exchanges. It has the virtue as well of providing a relatively clear line. If the issuer makes a recommendation or makes other statements that reasonably portray the transaction in a favorable light—in other words, if it presents the transaction in a manner objectively likely to predispose security holders toward or against it—it must comply with the proxy rules. If it confines itself to the basic facts, it need not do so.

*Id.* at 113–14. Because, in the view of the court, both sides' press releases contained editorial content, they all constituted proxy solicitations under the applicable law.

In *Chris–Craft,* the plaintiff made an unsolicited offer for a controlling number of shares in Piper Aircraft Corporation. Piper's management opposed the hostile takeover and invited a friendly offer from Bangor Punta. 426 F.2d at 571. Piper and Bangor Punta agreed on a deal whereby the latter would buy at least 50% of the former's stock. They then issued separate but similar press releases explaining the deal. Chris–Craft sued both Piper and Bangor Punta for an injunction. *Id.* at 572–73.

The press releases were quite detailed. They said that: (1) the Piper family would receive Bangor Punta securities for their shares; (2) Bangor Punta was going to file a registration statement with the SEC regarding an exchange offer for all remaining Piper Aircraft shares in return for Bangor Punta securities; (3) a Bangor Punta shareholders' meeting would be called for approval of the transaction; (4) Mr. Piper expressed the Piper family support for the transaction and their reasons for doing so; (5) Bangor Punta's management expressed its support for

---

8. Section 5(c) of the Securities Act of 1934, 15 U.S.C. § 77(e)(c) (1970), as amended, states in part that:

(c) It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security.

the transaction and its reasons for doing so; (6) Bangor Punta manufactured various types of recreational equipment; (7) sales of the combined companies would reach $450,-000,000 in that year; (8) Bangor Punta's purchase would be in the form of "a package of Bangor Punta securities to be valued in the judgment of The First Boston Corporation at not less than $80 per Piper share." *Id.* at 571–72.

The court held that it was the statement contained in item # 8 above which rendered the press releases a "solicitation," violative of Section 5 of the Securities Exchange Act of 1933. While the SEC-promulgated Rule 135 exempts certain disclosures of forthcoming issuances from the requirements of Section 5(c), Chris–Craft successfully argued that the categories of information permitted in a press release about imminent issuance of securities does not include the value of the securities to be offered. This technical fine point is the holding of the case. By no means does this case support the notion that a press release is *ipso facto* a solicitation.

In each of the Securities Act cases cited by the U/S CC, the emphasis was not on the mode of communication, but on its content. There is no question that under securities law and even under the Bankruptcy Code, a person may be found to have solicited in violation of the relevant statute by means of a press release or other widely disseminated communication if the communication includes a request for the reader's, listener's or viewer's vote. The Securities Act cases cited merely held that the press releases involved contained such improper content. Here, on the other hand, the Proponents promise to eschew making such requests. So the question is whether the communication that they do intend qualifies as "solicitation."

Perhaps due to the emergency nature of the motion and the very short time that the Proponents had to respond to it, the parties devoted very little effort to enlightening the Court as to securities law generally or why specific regulations under the complex Securities Acts should or should not be swallowed whole by analogy in bankruptcy. Likewise, this Court has had very little opportunity to fully examine or to digest the import of

securities law on this question. But our review of the handful of relevant cases in securities law indicates that the question of their applicability to bankruptcy law is anything but clear.

American Jurisprudence 2d explains that within securities law "the term 'solicitation' has been defined to include: any request for a proxy whether accompanied by, or included in, a form of proxy; any request to execute or not to execute, or to revoke, a proxy; or the furnishing of a form of proxy, or other communication to security holders, under circumstances reasonably calculated to result in the procurement, withholding, or revocation of a proxy." 69 Am.Jur.2d, Securities Regulation–Federal § 641 at 754. But the encyclopedia notes that there are a number of items excluded from the definition of solicitation, one of which is:

> a communication by a security holder who engages in an exempt solicitation or who does not, otherwise, engage in a solicitation, where the communication states how the security holder intends to vote and the reasons why, if the communication: (1) is by means of speeches in public forums, press releases, published or broadcast opinions, statements, or advertisements appearing in a broadcast media, or newspaper, magazine, or other bona fide publication disseminated on a regular [basis]. . . .

*Id.* The encyclopedia also explains that the SEC views this and other exclusions from the meaning of solicitation to be:

> a safe harbor from the strictures of the proxy regulations. In its view, the failure of a communication to meet the specific standards of a given exclusion in the safe harbor does not mean that a communication constitutes a "solicitation" within the meaning of the proxy regulations.
> Prior to the addition of sub-paragraph (iv) to SEC Rule 14a–1(1)(2), the literal breadth of the definition of "solicitation" created uncertainty and may have inhibited communications between security holders. Prior thereto, communications, such as advertisements appearing in publications of general circulation, which were indirectly addressed to security holders,

where the communication was made under circumstances calculated to result in the procurement, withholding, or revocation of a proxy, would have been considered to be solicitations.

*Id.* at 755.

Similarly, "[t]he definition of 'solicitation' as applied to public media has been altered by regulation and such statements or communications will only be deemed to be solicitations where made by a person who is otherwise engaged in a non-exempt proxy solicitation." *Id.* § 642 at 756. In addition:

A proxy solicitation through the medium of a newspaper advertisement is exempt from the proxy regulations, under the Exchange Act, where the advertisement informs security holders of a source from which they may obtain copies of the proxy statement, form of proxy, and any other soliciting material, and where the advertisement does no more than name the issuer, state the reason for the advertisement, and identify the proposal or proposals to be acted upon by security holders.

*Id.* at § 651 at 760–61.

[T]he requirements of this provision [dealing with proxy regulations] do not apply to communication by means of speeches in public forums, press releases, and other published or broadcast opinions, statements, or advertisements, provided that no form of proxy, consent, or authorization or means to execute such items is provided to a security holder in connection with the communication and provided that, at the time the communication is made a definitive proxy statement is on file with the SEC.

*Id.* at § 656 at 764.

Despite the requirements of SEC Rule 14a–3(a), certain solicitations in election contests may be made prior to furnishing the security holder with a written proxy statement required by that rule for all other solicitations. A solicitation in an election contest may be made without compliance with Rule 14a–3(a) if: (1) each participant in the solicitation complies with the filing requirements of the election contest rules; (2) no form of proxy is furnished to the persons solicited before furnishing the information required by Rule 14a–3(a), unless a written proxy statement meeting the requirements of schedule 14A has been furnished by or on behalf of the person making the solicitation; (3) information concerning the identity of the person making the solicitation and the ownership of securities of the issuer of such participant is furnished to the security holders in connection with the solicitation; and (4) a written proxy statement, in compliance with the proxy regulations, is furnished to security holders at the earliest practicable date.

*Id.* § 658 at 766–67.[9]

The U/S CC contends that even if a communication by the TCC and/or the Debtor may independently not be a solicitation for purposes of the Bankruptcy Code, by analogy to securities law, it may be seen as a prohibited solicitation "if it constitutes 'a step in the chain of communications ultimately designed to accomplish the procurement of a favorable vote on their plan.'" Motion at 6 n. 5 (citing *Schwartzberg II*, 929 F.Supp. at 110.). *See also* 69 Am.Jur.2d, Securities Regulation–Federal § 642 at 755 ("Any writings, whether they strictly solicit a proxy, which are part of a continuous plan ending in solicitation and that prepare the way for success of such solicitation, fall within the scope of the proxy rules."); *id.* at 755–56 ("If it is later found that there was a continuous plan to persuade security holders, the entire plan will be found to be in violation of the proxy regulations.... Such a result necessitates extreme caution prior to the use of any tactics, acts or practices, which might, on hindsight, appear to be part of a single, continuous plan. This line of reasoning also applies to press statements and releases. Even when such releases contain a qualifying statement to the effect that 'proxies will be solicited when the law permits,' statements that express an intent to solicit proxies have been deemed to be 'steps in the chain of

---

9. We express no opinion on whether these snippets are relevant, even tangentially, to the issue at hand. But the U/S CC, which cited securities law as its source of authority, had the burden of explaining its relevance.

communications' ultimately seeking the proxies of security holders, and qualifying statements in the materials have been held not to be controlling.")

On the other hand, as the Debtor indicated, companies that are required to report to the SEC are also required to issue press releases when something of great consequence occurs in the business.[10] Clearly the filing of a joint plan of reorganization between the Debtor and its largest group of creditors is significant. The parties disagree as to whether the Debtor is still a company required to make reports to the SEC and whether the Debtor has indeed been continuing to make such reports throughout the reorganization. *See* Transcript of Hearing, October 27, 1998 at 50. Nevertheless, even if the Debtor is no longer required to make reports and is therefore no longer required to issue announcements when significant events occur, it certainly does not mean that the Debtor is thereby prohibited from doing so voluntarily.

If there is any part of this confusing miasma of conflicting securities law mumbo-jumbo which seems peculiarly apropos, it is the following paragraph.

> Announcements of current events are to be examined with respect to the currency of the information, with announcements made directly upon the happening of an event being less likely to be deemed a solicitation than communications made some time afterward, and the time distance between the communication and the actual time for shareholder action being a measure by which it may be judged whether the communication constitutes a solicitation. Thus, a letter to the shareholders concerning current information, sent more than a month prior to the initiation of election contest and not mentioning the solicitation of proxies, is not considered a solicitation.

69 Am.Jur.2d, Securities Regulation—Federal § 643 at 757.

Once again, it is the temporal separation between the impending speech and the action of voting which appears to be the most im-

portant factor. In fact, some of the cases upon which the U/S CC most strongly rely recognize the diminishing effect of time on the potency of a communication:

> Perhaps the leading case is *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579 (5th Cir.[1974] ) ... [in which t]he Fifth Circuit held that the letter was not a "solicitation" and that Rule 14a–3 did not apply.... [T]he Court relied upon the facts that subjecting such a communication to the proxy rules would interfere with the goal of prompt disclosure of material events, *that the letter was distributed well in advance of any vote on the transaction,* and that the letter in recommending the transaction said "only that the directors did their fiduciary duty." *Id.* at 600–01. There was no claim that the letter or the press release was misleading.

*Schwartzberg II,* 929 F.Supp. at 111 (emphasis added). *Cf. Conagra,* 708 F.Supp. at 268 (emphasizing as a reason to grant an injunction that "the time for the proxy solicitation was close indeed" to the time of the press release).

In *Schwartzberg II,* the court denied Schwartzberg's request for an injunction against his adversaries even though it held that their press releases violated the securities laws. It reasoned that "[t]he meeting remains well in the future. No proxies actually have been requested." *Id.* at 116. Likewise here, the vote remains "well in the future" and neither of the Proponents has "actually ... requested" anyone's vote.

In this case, the joint plan was filed November 9, 1998. The media campaign will probably be started and finished during the few days between that filing and the issuance of this opinion. The hearing on the approval of the disclosure statement is not scheduled to commence until January 20, 1999. Assuming that the disclosure statement is approved immediately thereafter, the earliest that anyone could cast a ballot accepting or rejecting the plan will be February—about three months from now. Even if the Proponents'

---

**10.** Although the Debtor made this assertion in oral argument and has not cited the Court to any securities law statute, regulation or case to cor-

roborate it, it is clear from *Schwartzberg I, Schwartzberg II, Chris–Craft* and other cases, that some such duty does exist.

press releases and public relations campaign contain some self-serving "spin," time is likely to attenuate much of the taint.[11]

Applicability of this non-binding area of law to the bankruptcy setting is unclear. In part, this is because there are significant differences in the two areas of law that could impact on the scope of the term "solicitation" in either context. For instance, a registration statement filed with the SEC is secret, whereas a disclosure statement and plan filed with a bankruptcy court are public documents. This fact alone may justify ascribing a narrower definition to solicitation in bankruptcy than in securities law. An inquisitive reporter or investor has no means to verify the securities information released publicly. On the other hand, anyone with an interest in doing so, including reporters and those who are antagonistic to the Proponents, can study the publicly available disclosure statement for details supporting or rebutting any alleged spin.

We recognize that there is a spectrum of communication in bankruptcy ranging from a neutral, factual statement to an actual request to accept or reject a plan. Somewhere on that spectrum a communication crosses the line to become a solicitation. And based on the above discussion, it appears that a determination of where that line is requires consideration of not only the content, but the timing of the communication. Although the evidence presented has not convinced the Court that the proposed communications transgress into the realm of a solicitation, we are also of the view that a definitive decision on this point need not be made at present. For as will be discussed below, sufficient remedies exist to alleviate any harm that may be caused by improper communications.

## V. Equitable Considerations

Putting securities law aside, one could argue that the Court has the authority, pursuant to 11 U.S.C. § 105(a), to issue a preliminary injunction to prevent the media communications proposed here from taking place. *See, e.g.,* Statement of Leslie Berg, Transcript of Hearing, October 27, 1998 at 96 (agreeing that a prior restraint on the Proponents' speech "would be an exercise of the Court's equitable powers under [section] 105"). As *Schwartzberg II* suggested, the standards for issuing an injunction barring solicitations that are illegal under the securities law are the same as for injunctions generally. 929 F.Supp. at 116–17. *See also Conagra,* 708 F.Supp. at 261–62 (listing the traditional factors for preliminary injunctions). Therefore, in *Schwartzberg I,* the court recognized that "[e]ven proof of a violation of the securities laws at trial does not automatically warrant the issuance of an injunction...." 917 F.Supp. at 1064. After all, the movant carries the burden of showing that it will suffer irreparable harm absent the granting of a preliminary injunction. *See Chris–Craft,* 426 F.2d at 573.

We are similarly not persuaded that a little spin suggesting in general terms the wonderfulness of the joint plan will unduly influence creditors. We put little credence in the suggestion that a creditor, having the plan and the approved disclosure statement in hand, will make her decision to accept or reject that plan based upon a three-month-old news story.

Even if we thought that the Proponents' message will contain too much spin (i.e., too great a dose of public relations as opposed to neutral information), we are not persuaded that the case for equitable relief has been made. The potential for injury to the principles of the disclosure statement process is remote. Any statements issued to the media are likely to be incomplete since whatever the Proponents say will inevitably omit most of the complex details excruciatingly ham-

---

**11.** Indeed, this is the likely premise behind the securities law rule cited above that:

> the time distance between the communication and the actual time for shareholder action being a measure by which it may be judge whether the communication constitutes a so-

licitation. Thus, a letter to the shareholders concerning current information, sent more than *a month* prior to the initiation of election contest and not mentioning the solicitation of proxies, is not considered a solicitation.

69 Am.Jur.2d, Securities Regulation—Federal § 643 at 757 (emphasis added).

mered out over the past four months. But mere incompleteness does not make the statements misleading. Indeed, the *Chris–Craft* and *Schwartzberg* cases cut the other way as those courts faulted the press releases for providing too much information.

The Proponents vowed to include appropriate disclaimers such as the "Court must approve a disclosure statement before Dow Corning and the Tort Committee can seek acceptances of the Joint Plan." Joint Response at p. 4. When asked whether it might go too far with its media communications the Debtor stated: "[W]ill we … push that line? I think undoubtedly the answer is no, we won't. [The media communications] will be much more circumspect than that … because we don't want to get into [a] fight" over whether such circumstances constituted a solicitation. Statement of Craig Litherland, Transcript of Hearing, October 27, 1998 at 63. If we were inclined to grant relief to the U/S CC, these sorts of qualifying statements are the types of restraints we would have placed on the Proponents' communications. *See, e.g., Virginia State Bd. of Pharmacy*, 425 U.S. at 771 n. 24, 96 S.Ct. 1817 (stating that methods for preventing the harmful effect of misleading commercial speech include "requir[ing] that a commercial message appear in such a form, or include such additional information, warnings, and disclaimers, as are necessary to prevent its being deceptive"). Inasmuch as they volunteer to couch their communications with such precautionary advice, the likelihood that the Proponents' press releases, press interviews and the like will unduly influence a creditor's vote on the plan which emerges from the disclosure hearing process and the continuing negotiations with other constituencies is slight. *See Chris–Craft*, 426 F.2d at 573 (defendant's stipulation to refrain from proceeding made injunction unnecessary); *Schwartzberg II*, 929 F.Supp. at 116 (noting

as reason for denying request for injunction that the parties had now filed the preliminary proxy statements with the SEC "and there is no suggestion that [they are] not in full compliance with the law").

Finally, the harm, if any, which may potentially result from the Court's staying of its hand is easily remedied. The U/S CC, the PCC and the U.S. trustee all suggested that prophylaxis is preferable to cure. They contend that if the Court later determines that the Proponents improperly solicited votes before disclosure statement approval, it would be more or less compelled to "designate" (i.e.: disqualify)[12] those creditors whose acceptances of the plan were procured thereby. *See, e.g.,* Statement of Sheryl Toby, Transcript of Hearing, October 27, 1998 at 14 ("Do you wait until after the vote and say 'Oh, let's throw it all out' and say 'Let's start all over again?' ").

We disagree. What the U/S CC calls the Proponents' "media campaign" is likely to be conducted contemporaneously with the filing of the joint plan. Upon a showing that the Proponents' efforts crossed the line into the realm of solicitation, it would be easy for the Court to include an effective "curative instruction"[13] of our own in the ballot package. We therefore conclude that, since there is little chance of irreparable harm, the case for a preliminary injunction has not been made.

## VI. Conclusion

At bottom, the Court is called upon to take an unprecedented activist role in what is, in essence, a democratic process. The U/S CC is asking the Court to become a legislative or administrative body whose task is to pen the minutiae of which words and phrases are legal and which ones are not. How can a judge ever hope to construct guidelines that encompass all of the different methods of speech that may be engaged in by the many people employed by the Proponents? It is

---

**12.** "On request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was … not solicited or procured … in accordance with the provision of this title." 11 U.S.C. § 1126(e). The term "designate" generally has been defined to mean disqualify. *7 Collier on Bankruptcy* at ¶ 1126.06; *4 Norton Bankruptcy Law & Practice 2d* § 91:24.

**13.** The *Schwartzberg* court termed it "corrective disclosures," and acknowledged that ordering them is sometimes a useful remedy. *Schwartzberg II*, 929 F.Supp. at 116 n. 13; *Schwartzberg I*, 917 F.Supp. at 1064.

an extraordinary request, particularly given the fact that most illegal speech is punished after the fact (e.g. slander, libel, perjury, espionage, false advertising and even securities law violations). Simply put, the U/S CC asks us to step into a role that no court should easily accept. And in the Court's view, no good reason has been shown that would justify us accepting such a role here.

■ When it comes to placing prior restraints on speech, we believe that courts should proceed with great hesitancy. And after considering all of the evidence, courts should hesitate again. Assuming that the Proponents' proposed communication is commercial speech, and assuming that this speech may later be found to be a solicitation, sufficient remedies are available post-hoc in the bankruptcy context to correct any harm that may have been caused. Therefore, we believe that the powerful case that someone asking a court to limit speech must make has not been made. For this reason, we declined to take the paternalistic approach urged by the U/S CC and denied the motion by an order that was signed last Friday.